## THE LAURA.

1. The master, officers, and crew of a vessel, with every person on board, having gone off in extreme anxiety for their personal safety from the vessel on to another which they had brought to them by signals of distress, the mere expressed intention by the master to employ if possible a tug to go and rescue his vessel (she then lying at anchor in a violent gale), to which expression of intention, the person to whom it was made replied, that he "could not get a tug that would come and bring the boat in, as the weather was too rough," was held not sufficient to deprive the vessel of the character of a derelict, so far as timely effort to save her was contemplated.

2. A vessel undertaking in good faith to perform the office of salvor to a derelict vessel, held not responsible for the latter having been wholly lost in the effort to save her.

APPEAL from the Circuit Court for the District of Louisiana; the case being thus:

The high-pressure steamer Savory and the steamer Laura, a low-pressure steamer of a rival line, were in the habit, in the year 1866, of plying on Lake Pontchartrain; that is to say, of going up and down from the mouths of the rivers Tangipahoa and Tchefuncta (streams which empty into the north part of the lake), and from the towns of Mandeville and Madisonville (also on the north part of the lake—its northeast part—and not far from each other, or from the mouths of the rivers named), to the railroad-landing, on the southwest part of the lake, of a short railroad which goes to New Orleans. The length of the lake is about thirty-six miles. As is common between steamers of opposing lines, there was some rivalry between them.

On the night of Friday, January 19th, 1866, the Savory, with twenty-five people on board—seven of them paying as passengers—and with a raft of timber in tow, had come from the Tchefuncta, and was on her way from the Tangipahoa to the railroad-landing. She had gone well down the lake when a gale came up which, increasing in severity, compelled her to cut away her rafts and to come to anchor. The Savory had been built originally as a river-boat, "high

up," and was not specially adapted to the lake navigation. When she cast anchor, as just mentioned, she was within five or six miles of the railroad-landing where she wanted to go, and not more than a mile and a half from the western shore of the lake. On that shore, and within three or four miles of where the vessel was anchored, was what is called the "Old Basin," and rather closer to her what was called the new one. The gale increased. About 3 o'clock of Saturday morning it became very steady, and the danger of her sinking was so considerable that the utmost anxiety prevailed among her officers, crew, and the few passengers on board, to get off her. The captain ordered the flag to be raised Union down; had his life-boat made ready; had driven spikes across the edges of a bale of cotton, and attached ropes to these for persons in the water to hold to and swim or float to shore; and by what he said, and by what in various ways he did, showed extreme anxiety for the safety of all on board, including specially himself.

In this state of things, and about 10 o'clock on the morning of Saturday, the Laura, being on her usual trip, hove in sight. The captain of the Savory at once blew signals of distress from his steam-whistle. "What can I do for you?" was the inquiry of the captain of the Laura on hearing the whistle and seeing the Union down. "Save my passengers and crew," was the reply from the Savory. Thereupon the captain of the Laura came alongside; in doing which, owing to the violence of the wind and waves, he was driven against the Savory with so much force, that the wheel-house of the Savory was considerably torn by the contact. As soon as she got near enough for persons on the Savory to pass on board of her, they began to come; the clerk of the Savory first, and her captain right afterwards; the third or fourth person who did come. "There was no degree of order," said one witness, "observed by the passengers in getting on. They were very much excited, and came on the Laura the best way they could. We had to tell them several times to be calm, that there was no danger." The captain ordered two or three men to remain, but not one single one of them

did remain; and as the Laura left the Savory, her captain was heard to remark, in reference to her, "There are $5000 gone!"

Subsequently, and on their way down the lake, the captain of the Savory told the captain of the Laura, as that officer swore, that he was "going to try to get a tug to bring the Savory out;" to which the captain of the Laura told him that "he could not get one in the whole basin that would come out and, bring his boat in, as the weather was too rough." The captain of the Savory swore that he said he was going ashore to get a tug to bring his boat in.

The Laura now arrived at the railway-landing where both vessels had been bound, and there, in about three hours after she left the Savory, and in about three-quarters of an hour after her arrival at the landing, she had landed her own passengers and those which she had taken from that steamer. Here the owner of the Laura, one Frigerio, came on board. After the freight was discharged and the Laura was about to make a return trip, her captain went to Frigerio: "I told him," said the captain, "that it was my duty to go over there and save that steamer, and asked him if he would let me go." He replied, "that I was the captain of the boat, and had to use my own discretion." The captain hereupon went on his trip for the other end of the lake, meaning to make fast to the Savory and tow her to the Tchefuncta River, the place whence the Savory had come, and near to which, as already said, was the town of Mandeville, where he himself was going in regular course. The captain of the Savory, while on the landing, saw the Laura reach the Savory, take her in tow, and start to sea with her, heading northward for Mandeville. After that, and on the same Saturday afternoon, he went to New Orleans and engaged a tug, then lying in the New Basin, to go after the Savory. The tug did go after her; setting off on Sunday morning at 9 o'clock; the captain of the Savory on board. "We had heard, before we started," said the chief engineer of the tug, "that the Savory had been taken off by the Laura; and she was by us supposed to be at Mandeville.

We went in sight of Mandeville, saw that the Savory was not there; then changed our course for Madisonville, but did not find her there. We found the Laura there. The captain of the Savory went aboard of the Laura; returned, and ordered us back to New Orleans."

The history had been thus: The Laura, on arriving at the Savory, found her wheel-house, as already mentioned, considerably torn by the contact which she had made with her when signalled to come to her relief; that her chimneys were loosened and careened, and that, though the vessel was not leaking, the waves were breaking over her decks, and water getting into her hold. Her captain went alongside, struck her bulwarks a little, but not so, he thought, as to make her leak, caused the chain to be cut, put three men aboard of her to keep her clear of water, and took her in tow; his "intention being," as he testified, "to save the boat, if he could, by towing her into smooth water on the north shore, which was the only place where there was smooth water." The sequel was thus told by the captain himself:

"I towed her about ten or twelve miles, with her chimney hanging pretty well on her starboard side, which was loose and shaking from one side to the other. I found the boat was coming more to the starboard all the time, and then sung out to the men to heave some of the wood and lumber overboard, off the starboard side. This was done, but did not help her much. The water went in her so strong that finally she capsized bottom up. One of the men was in the pilot-house when she capsized, the other two finally came up amongst the broken-up cabin. I then went and picked up the three men, and went on my trip to Mandeville."

The captain gave it as his belief, that "had the Savory remained at anchor where she was, and with the weather that prevailed; she would have gone down in six hours, as the norther blew until next day, and harder that night than in daytime."

When she went down, the captain of the Laura said that "that would be the fate of all the high-pressure steamers on the lake."

The owners of the Savory, after the disaster, filed a libel both against the Laura and her owner, Frigerio, alleging that when the vessel was lying at anchor in Lake Pontchartrain, near Lakeport, and within a half-mile of the shore, and when she was neither abandoned nor in need of assist-ance, the Laura, under the direction and at the instance of Frigerio, did wrongfully take her from her anchorage and tow her out into the lake, and then sink her.

Frigerio, answering for himself, and as claimant of the Laura, set up that the Savory was in a sinking condition, abandoned by her officers and crew, and that in an effort to save her by towing her to a place of safety, she capsized and sunk; that this result was without fault on his part or of the officers of the Laura, but was the result of a severe gale and of the crippled condition of the Savory.

Evidence was taken and the facts as above presented, including the alarm of the captain of the Savory, and indeed of an extreme anxiety for his own personal safety, fully established. On the hearing in the District Court, however, and in the face of this he denied that he knew that the Union was down, and swore that he gave no orders for signals of distress. He swore also that he had a permit from the custom-house to carry passengers; while the inspector of steamboats for New Orleans showed that he had none.

The District Court decreed in favor of the libellants. The Circuit Court reversed this decree and dismissed the libel. The owners of the Savory now brought the case here.

*Mr. J. Hubley Ashton, for the appellants:*

1. The Savory and the Laura were opposition boats, running on Lake Pontchartrain, by regular trips between New Orleans and the same towns. There was a good deal of rivalry and jealousy between them; and obvious ill feeling on the part of the owner and master of the Laura to high-pressure steamers. It is perhaps not a greatly-strained conclusion that the Laura meant to destroy this vessel. Such is the impression certainly of the libellants.

2. The Savory was anchored not more than three or four

miles from the entry of the Old Basin, and somewhat nearer the New Basin, and although she might easily have been towed into the New or the Old Basin, if the master of the Laura really meant to save her, and although the master of the Laura professes to have believed she would have gone down at her anchorage if he had never touched her; nevertheless he cut her anchor chain, attached a hawser to her, and attempted to cross the lake, a voyage of thirty miles, in the face of a head wind and a rough sea, with the Savory in tow. The result was as might have been expected. In three hours, the gale being very heavy, little or no progress was made, but the Savory went down; pulled obviously to pieces.

3. It is not pretended that the master or owner of the Laura had any authority from the owners or master of the Savory to touch that vessel. The right to do what was done, if right existed at all, must be rested on the fact that she was derelict.

But the Savory, at the time she was taken by the Laura, was not derelict. The owners were in constructive if not actual possession of her. The master swears that he gave no orders for signals of distress, and that he did not know that the flag had the Union down. All this shows that the condition of the vessel was not one of great peril, and that the case could not have been one of derelict. What constitutes a case of *derelict* has been authoritatively defined by this court:

"The abandonment must have been final, without hope of recovery, or intention to return. If the crew have left the ship temporarily, with intention to return after obtaining assistance, it is no abandonment, nor will the libellants be entitled to salvage as of a derelict."*

The British admiralty authorities are likewise clear to the point, that in every case of derelict there must be an abandonment *animo derelinquendi;* and that the intention *at the*

---

* The Island City, 1 Black, 128.

*time of going* is the point on which the question of derelict must be decided.* The evidence shows affirmatively that the master of the Savory left her temporarily, for the purpose of obtaining a tug to tow her into the basin. Conclusive proof of his purpose is furnished by his subsequent acts in execution of his original intention of obtaining assistance. We have seen that he went at once to New Orleans and engaged the services of a tug, and followed the Savory with her to Madisonville.

The case in short is one of a trespass, and the vessel having been lost the Laura and her owners are responsible.

*Mr. T. J. Durant, contra.*

Mr. Justice MILLER delivered the opinion of the court.

Some attempt is made to show that the Laura and the Savory were rival vessels in the same trade, and that the result was due to the wish of the owner or the master of the Laura to remove a competitor in business. But of this there is nothing but suspicion. On the contrary, there is strong evidence that the master of the Laura, who controlled her entirely in the matter, though her owner was on board, was governed by a sincere wish to afford all the relief he could to the Savory and her passengers and crew.

It is also argued that the master showed a culpable want of skill and judgment in attempting to carry the Laura across the lake, instead of trying to get her into the mouth of the old or new canal, within a mile or two of where she was abandoned. But though there is some apparent conflict of testimony on this point, we are satisfied that the master of the Laura was justified in assuming that in such a gale as was then blowing, it was more dangerous to attempt to land her in either canal than to tow her across the lake to calmer water, and a safe harbor on the other side.

The only question of any doubt in the case arises on his right to interfere at all to save the vessel. The libellants

---

* The Cosmopolitan, 6 Notes of Cases, 24; The Aquila, 1 C. Robinson, 40; The Barefoot, 14 Jurist, 841; The Sarah Bell, 4 Notes of Cases, 146.

deny this right on two grounds: 1st,.that she was safe where she was; and, 2dly, that the master of the Laura was distinctly informed by the master of the Savory, that he was going ashore to get a tug to relieve her.

1. In regard to the condition of the vessel at the time the Laura took her in tow, we are of opinion that it justified the belief that her condition was one of great peril and that she would sink in a short time if left alone.

The testimony of the master of the Savory, which it is argued shows a state of facts that would not justify this conclusion, is so fully contradicted, and he appears to have been so overcome with fear at the time of leaving the vessel, that but little credit can be given to any of his statements.

2. It is sworn by the master of the Savory that on his way to the railroad landing he told the master of the Laura that he was going ashore to get a tug to bring his boat in. The master of the Laura swears that the master of the Savory did say that he was going to try to get a tug to bring the Savory out, to which he replied that he could not get a tug in the whole basin that would come and bring the boat in, as the weather was too rough.

This conversation evidently had reference to the tugs in the basin at the mouth of the canal, and the efforts of the master to get a tug in New Orleans were not in pursuance of this conversation, for he expressly says that he saw the Laura start with the Savory before he left the shore for New Orleans. This effort was to bring her back from such place as the Laura might have carried her to, and shows that he did not think it probable she could be navigated without such assistance.

In the case of *The Esperance* the claimants received a letter from the master, who, with the crew, had left the vessel, advising them of the fact, and immediately sent proper persons to take charge of her and her cargo. But before they arrived other salvors had taken the vessel and finally brought her in and libelled her. Sir W. Scott said it was a clear case of derelict; there was first the chance of the party sent

by the claimants not finding her; and, secondly, that if found, she would be a complete wreck.*

In the case of the brig *John Gilpin*,† Judge Betts, in considering a question of derelict somewhat analogous, said, that "she" (the vessel) "was apparently abandoned, and if her crew might have been absent to procure assistance from other vessels and more force, their ability to return to the wreck, or the chance of affording any aid after the lapse of a few hours, must, in the then condition of things, have been most dubious contingencies."

In *The Coromandel*,‡ Dr. Lushington, in speaking of a case very similar to this, remarks: "It may be perfectly true that the master and these fifteen men, when they had got on board the Young Frederick, and were sailing away to Yarmouth, intended, if possible, to employ steamers to go and rescue the vessel, which was at no great distance. But is not that the case every day? A master and crew abandon a vessel for the safety of their lives; he does not contemplate returning to use his own exertions, but the master hardly ever abandons a vessel on the coast without the intention, if he can obtain assistance, to save his vessel. That does not take away from the legal character of derelict." This language applies with a precision remarkable to the case before us. And the casual observation of the master abandoning the vessel in great fear for his own immediate personal safety, that he designed to get a tug to bring his boat in, is of the class of intentions referred to by Dr. Lushington above, and that he made no response to the reply of the captain of the Laura, that he could get no tug to try it in such rough weather, shows the truth of Dr. Lushington's remarks.

We think that the master of the Laura was authorized to conclude that the Savory was in a condition of immediate peril, and abandoned so far as any timely effort to save her was contemplated; that he acted in good faith, and with reasonable judgment and skill, and that, therefore, the libel

---

* L'Esperance, 1 Dodson, 46    † Olcott, 78.    ‡ 1 Swabey, 208.

of appellants was properly dismissed by the Circuit Court.
The decree is accordingly

AFFIRMED.