THE FAIRFIELD.

THE MARY ODELL.

ESTILL and others *v.* THE FAIRFIELD, etc.

*District Court, S. D. Georgia, E. D.*   February 22, 1887.)

1. SALVAGE—ABANDONMENT—REMUNERATION.
    Where a schooner is run aground on an exposed bank, six miles out to sea, begins to pound heavily, and is abandoned by the master and crew, and is found by another vessel the next day eleven miles out to sea, and drifting seaward, abandoned, with the hatches open, and the waves dashing over the deck, and in danger of filling, she is derelict, notwithstanding the master may have intended to return to her.

2. SAME—AMOUNT ALLOWED—REMUNERATION.
    "The principles on which the court of admiralty proceed, lead to a liberal remuneration in salvage cases; for they look not merely to the exact *quantum* of service performed in the case itself, but to the general interest of the navigation and commerce of the country, which are generally protected by exertions of this nature." Lord STOWELL.

3. SAME.
    Five hundred dollars allowed in this case for salvage services.

(*Syllabus by the Court.*)

In Admiralty.   Libel *in rem* for salvage services.
*Lester & Ravenel*, for libelant.
*George W. Owens*, for claimant.

SPEER, J.   On the twenty-ninth day of October, 1886, the pilot-boat Mary Odell, W. J. Thompson, master, was cruising off the mouth of the Savannah river.   About 10 miles north-east of Tybee light the Mary Odell sighted a schooner drifting out to sea.   The schooner was abandoned, though not damaged.   There was no one aboard of her.   The pilot boat hauled up for her, and having boarded her, found that she was the Fairfield, of Wilmington, North Carolina, with a cargo of rough rice.   A portion of the crew of the Mary Odell was put aboard of her, and she was carried into the harbor of Savannah, and she was there libeled for salvage, and with her cargo was sold by the United States marshal, bringing altogether the sum of $2,051.51.   Joseph A. Roberts, a shipping merchant of Savannah, for the owners of the Fairfield, filed a claim to the proceeds arising from the sale, and the question to be determined is what amount of salvage shall be allowed the owners and crew of the Mary Odell.

There is no serious dispute about the facts.   It appears from the testimony of the master of the Fairfield that he left the Savannah river with a crew of negroes and a negro pilot; that his pilot ran him aground about six miles from Hilton Head, at a place which another witness, Sisson, the light-keeper at Hilton Head, testified was the outer edge of the Gaston bank; that his vessel began to pound pretty heavily, and that his crew at once announced their intention to leave him, and go ashore.

He tried to get them to help him put the hatches down, but they refused. He had but one boat; of this they took possession. Fearing to be left alone on his schooner, he went in the boat with his crew. He left the schooner aground, first dropping the anchor. He left when the sun was about "half-hour high." He got ashore between 8 and 9 o'clock that night; that he applied to the keeper of the light-house the next morning to lend him a glass so that he might see his schooner, and also a chart. This testimony as to his conversation with the light-keeper is corroborated by the latter. The testimony of the persons on board the pilot-boat is to the effect that when they boarded the Fairfield she was four miles east of the Gaston bank. She had dragged her anchor, or it had been loosed by the rising of the tide. The schooner was in seven or eight fathoms of water. When they boarded her, about 11 miles from land, her hatches were not down, the waves were dashing upon the deck, and, being without control and loaded, she was liable to fill at any time. It will be understood that this was on the Atlantic ocean, and "outside," and in a rather lonely portion of the coast, and the schooner was drifting out to sea.

I think the Fairfield was clearly derelict. The definition given by Sir LEOLINE JENKINS, when he says that derelicts are "boats or other vessels forsaken or found on the seas, without any person in them," is pronounced by Mr. Justice STORY the true definition in its most broad and accurate sense. *Rowe* v. *The Brig*, 1 Mason, 374. This is practically approved by the supreme court of the United States in *The Laura*, 14 Wall. 344, where they cite an opinion of the eminent Dr. LUSHINGTON, where he says:

"It may be perfectly true that the master and these fifteen men, when they had got on board the Young Frederick, and were sailing away to Yarmouth, intended, if possible, to employ steamers to go and rescue the vessel, which was at no great distance. But is not that the case every day? A master and crew abandon a vessel for the safety of their lives. He does not contemplate returning to use his own exertions; but the master hardly ever abandons a vessel on the coast without the intention, if he can obtain assistance, to save his vessel. That does not take away from the legal character of derelict."

The outrageous conduct of the crew of the Fairfield the night before, and the absolute helplessness of the master, who was but little more than a boy, afforded but little hope that he could have regained the deck of his vessel. He could not make her out from the shore the next morning without the use of the glass. There was no help at hand, and I think it is very doubtful, whether in an open boat, he could have reached the schooner, which, by all accounts was at least 11 miles out to sea, and drifting further every moment. Nor could he have navigated her without assistance. There is no evidence that he had any means whatever of reaching the vessel save his boat; and after his abandonment by his crew, he had no one to depend on but himself. Those who are familiar with the desolate and lonely shores upon which the hard fortune of the Fairfield's master had cast him, and who understand that the class upon whom he must of necessity rely for help, while singularly expert

in the management of a canoe or dug-out on interior waters, have a wholesome indisposition to brave the rollers of the Atlantic outside, can well appreciate his helplessness. While his vessel may not have been derelict the evening before, and as long as the "*animus revertendi*" was reasonable and practicable of performance, the next morning it was clearly derelict, and but for the fortunate interposition of the Mary Odell would in all likelihood soon have foundered.

The rate of salvage remains to be determined. There seems to be on this subject no fixed rule nor binding precedent in admiralty, and the reward in derelict cases should generally be governed by the same principles as in other salvage cases, viz., in proportion to danger, to property value, risk of life, skill, labor, and the duration of the service. 2 Pars. Ship. Adm. 293. It may be taken as the prevailing disposition of admiralty courts, or, as has been said, as the general sense of the maritime law, that salvage in derelict should not in ordinary cases go below one-third, and never, or almost never, above one-half of the value saved. There are cases where the salvage is attended with so little difficulty and peril that it would entitle the parties to little more than a *quantum meruit* for work and labor done. It is true, I think, however, that it is within the legal exercise of the discretion of the court, even where the peril and risk of the salvor have not been very great, to give something more than a mere *quantum meruit*. On this question, "an enlarged policy," says Mr. Justice STORY, "looking to the safety and interest of the commercial world, decrees a liberal recompense, with a view to stimulate ambition by holding out what may be deemed an honorable reward. Nor should it be forgotten that the same policy has a strong tendency to discourage petty plundering and concealment of the property saved, and to induce salvors to bring it in good faith before judicial tribunals, and rely upon their justice for an ample remuneration." *Rowe* v. *The Brig,* 1 Mason, 375.

The elegant and luminous Lord STOWELL, whose decisions possess as great weight in admiralty as do those of his brother Lord ELDON in equity, has also declared:

"The principles on which the courts of admiralty proceed lead to a liberal remuneration in salvage cases; for they look, not merely to the exact *quantum* of service performed in the case itself, but to the general interests of the navigation and commerce of the country, which are generally protected by exertions of this nature." Quoted in *The Emulous,* 1 Sum. 207.

In view of all the circumstances of this case, considering the loneliness of the coast, the almost absolute certainty that but for the Mary Odell the Fairfield would have been lost, and the completeness of the success, in the absence of allegations in the libel definitely showing the names and rank of the different persons who took part in the service, I award $500 for salvage, to be awarded as follows: To the owners $250; to the master of the pilot-boat $25; to the person in command of the Fairfield, and who brought her into the Savannah river, $10; the remaining $215 to be divided among all the officers and crew of the Mary Odell, including the master, in proportion to their respective wages, ex-

cept that the pilots on board for this purpose are to rank as ordinary seamen. After payment of the clerks', marshals', and proctors' fees, amounting to $279.75, and $46 to the Propellor Tow-boat Company; $10 to Daniel Cyler, watchman; $17.50 to the board of port wardens of Savannah; and $20 to Henry T. Botts, for special services rendered the schooner and cargo as per bills rendered and of file,—the remainder of the fund, to-wit, the sum of $1,178.25, is awarded to Joseph A. Roberts, intervenor for the owner of the Fairfield.