CONSOLIDATED TOWING
COMPANY, Plaintiff,

v.

Esther HANNAH, Administratrix of the
Estate of Elwon S. Hannah,
deceased, Defendant.

No. 76CV718–W–2–6.

United States District Court,
W. D. Missouri, W. D.

March 10, 1981.

Michael D. O'Keefe, Thompson & Mitchell, St. Louis, Mo., John A. Vering, III, Dietrich, Davis, Dicus, Rowlands & Schmitt, Kansas City, Mo., for plaintiff.

P. Wayne Kuhlman, Liberty, Mo., for defendant.

## MEMORANDUM OPINION AND ORDER

SACHS, District Judge.

This admiralty case stems from a controversy between the owner of a tow-boat, M/V Celisia Ann, and a would-be salvor of the boat, the late Elwon S. Hannah. The unmanned boat slipped from its moorings in June 1976, and sank about 100 feet from the North (left) bank of the Missouri River, apparently after striking a bridge in Kansas City. Valued at some $350,000, the boat was promptly considered to be worthless after the sinking. The owner received payment from its insurer for a total loss, except for radar equipment and other personal property which was removed from the vessel. At all pertinent times the owner and its insurer considered the boat a liability rather than a potential asset, in that it constituted a threat to navigation and the Army Corps of Engineers was insistent on its removal from the navigable portion of the river. Buoys were placed around the vessel and it ultimately remained in partially sunken condition in the 9-foot channel for two and a half years, until wrecked and removed by a contractor with the insurer at a cost of $450,000.

Elwon Hannah and his teen-age sons viewed the sunken boat as a desirable property. Hannah had some slight experience in salvaging items which floated down the river during the 1951 flood; he thereafter had several years experience in marine salvage in his own business in San Diego, California. After various telephone contacts, Hannah made a written offer to the owner's insurer on July 7, 1976, for removal of the boat from the shipping channel at a cost of $83,000, plus all salvage. The owner at various times attempted to abandon the boat to its insurer or to the Corps of Engineers, but did not succeed in transferring responsibility. The owner had wreck removal and liability insurance with its casualty insurer, and was generally represented by the insurer during the ensuing controversy.

On August 3, 1976, the insurer's consultant in New York recommended to the owner's broker that Hannah's offer be accepted; the consultant supplied the broker with a proposed contract. Hannah was informed by the consultant that he could expect to receive a written agreement. Either the owner or the broker, however, wished to have additional insurance protection, particularly a performance bond from Hannah guaranteeing against Hannah's worsening the situation; for example, if Hannah raised the boat but lost it downstream further liability might be incurred.

On August 17, 1976, Hannah was advised that insurmountable insurance problems prevented acceptance of his contract terms. The insurer then entered into negotiations on behalf of the owner with another potential salvor, Dave Houston. Hannah was advised of the Houston negotiations in early September, 1976. Being unwilling to let an attractive opportunity slip by, and believing the law permitted voluntary salvage operations under the circumstances, Hannah took possession of the boat in mid-September, 1976, giving notice to various parties, and posting a notice on the boat itself claiming a right of "marine salvage." The insurer, owner and Houston considered that Hannah had unlawfully "commandeered" the vessel.

Efforts by Hannah and his crew to raise the boat and bring it closer to the river bank need not be detailed. Hannah's sons, who participated in the project, testified as to the equipment (cranes, pumps, etc.) used at the site, and told about the work performed day and night by Hannah and an unpaid crew. Equipment not owned by Hannah was borrowed. Hannah testified, by deposition taken previous to his death, that he had made various promises of payment, generally contingent on success.

Houston proceeded concurrently but with some delay to enter into a salvage contract, insurance contracts, and a land leasing agreement to permit him to attempt to salvage the boat. Houston's terms were essentially the same as Hannah's, apart from the additional insurance policies, per-

formance bond, and a $300 payment for the land lease agreement.

As part of an effort to block Hannah's operations, the landowner instructed Hannah to remove his equipment from the river bank nearest the vessel. This made it unfeasible for Hannah to proceed. His deposition testimony, however, indicated that he had previously been able to float or slide the boat some 25–30 feet closer to the shore. His sons supported this contention; the insurer's consultant, however, disputed the testimony, based on his casual personal observations, and contended that silting inside the boat made it impracticable to carry out either the Hannah or Houston plan. It is unnecessary to resolve the question of partial success, although the Hannah sons were close observers and testified credibly. Whether Hannah would have been fully successful, if there had been no interference, is more doubtful.

Tensions between the parties worsened, and various acts of sabotage of the Hannah efforts occurred. Gunfire was directed at the boat, its source has not been traced. Hannah's crew was thereafter armed, with guns being displayed when an effort was made by Houston and various law enforcement officials to board the vessel. Hannah persistently advised interested persons that they were ignorant of the controlling principles of maritime salvage law. Hannah was self-educated in the applicable law.

When Houston's documents were fully prepared, in November, 1976, the owner (financed by its insurer) brought this suit against Hannah, seeking "a warrant of arrest of the vessel," under Rule D, Supplemental Rules for Certain Admiralty and Maritime Claims. The complaint also seeks injunctive relief and damages for expenses and delays. Proceeding without counsel, Hannah appeared before then-Chief Judge Becker of this Court on November 17, 1976. Judge Becker heard the statements of the parties and then issued a temporary restraining order. He advised Hannah to get a lawyer, and suggested that Hannah pursue any claim for relief he might have "against the owners or against the vessel ... in an orderly manner in court in this action." Judge Becker declared, "we are going to have an armistice in this war."

Procedural regularities then took hold, although Houston testified that someone on the shore persisted in firing weapons after he assumed salvage operations, under agreed procedures. The source of the violence remains unclear; it is at least possible that some third persons were at all times interested in having their chance to acquire the vessel.

A stipulation and order during litigation vested all rights of salvage and removal in the plaintiff (owner), and plaintiff was required to provide a $90,000 bond "to secure any claims" of Hannah. Hannah filed a counterclaim, asserting large expenditures in time and equipment, and seeking judgment for $150,000 for interference with his alleged salvage rights. He did not assert breach of contract although the parties were close to a contract in early August, 1976. While not material in light of the Court's ruling, it may be noted that Hannah gave Judge Becker a "ballpark" estimate of $40,000 as the value of services and equipment usage, but thereafter supplied a detailed breakdown totalling $75,768. The insurer's consultant testified that the Hannah listings of charges for equipment included no "outrageous" values.

After Houston acquired possession of the vessel, about December 1, 1976, he was unable to move the vessel. He testified to problems of cold weather and ice in January, 1977; plaintiff's trial brief makes reference to high waters; the insurer's consultant testified at trial, however, that in his opinion neither Houston nor Hannah had the capability of removing silt and moving the vessel. Houston was still trying to get back on the job, a year later, in January, 1978, but when he induced the Corps of Engineers to make further demands on the owner, the insurer failed to reemploy Houston and contracted with one Detrich for wrecking services by using explosives, which ultimately accomplished the removal of the vessel before the end of 1978.

Under this Court's Local Rule 20 the parties have stipulated in Standard Pretrial Order No. 2 to some 31 statements of fact, which parallel most of the above statements and are adopted herein by reference as additional findings of fact.[1]

## I.

Dealing first with the plaintiff's claim, insofar as it seeks permanent possession of the vessel and an injunction against interference by Hannah, the case has been mooted by Hannah's death and the destruction by plaintiff's insurer of the M/V Celisia Ann.

Plaintiff's complaint also seeks judgment for "its costs and expenses incurred as a result of the wrongful acts" of Hannah. The complaint alleges that "the delays caused by the wrongful acts" have greatly "enhanced plaintiff's costs of removal" of the vessel. The damage theory presented at trial is that plaintiff should receive judgment against the Hannah estate for $377,-000 (actually $367,000), the difference in cost between the Houston removal contract and the Detrich removal contract.

▮ Plaintiff's damage claim lacks merit, even assuming arguendo that Hannah committed wrongful acts, in that (1) the Detrich contract was not an obligation of plaintiff's, but was signed by the insurer alone and paid directly by the insurer, which is not a party to this litigation, and (2) it is speculative to contend that if Houston had been able to have a few additional weeks to perform his salvage contract, which was dated October 14, 1976, he would have been able to perform. Plaintiff's own evidence, in rebuttal to the Hannah counterclaim, questions the feasibility of performance by either Houston or Hannah.

Houston was unable to move the boat. His testimony was not persuasive as to either his capability of moving the boat or any decisive effect of the brief delays caused by Hannah. While December work was doubtless more unpleasant and difficult than work in October or November, the absence of accomplishments in December, and the failure to resume operations at an early opportunity in 1977, make it impossible to fairly conclude that an earlier start by Houston could have saved plaintiff or its insurer the money which plaintiff claims.

Even if plaintiff had otherwise presented a meritorious claim at trial, the Court notes that it might well have denied relief, because plaintiff failed to comply with the procedural requirements of Local Rule 20. Among other things, that rule requires pretrial listing of exhibits and a pretrial statement by the parties, with specificity, of *all* factual issues to be litigated; "a mere general statement will not suffice." *Missouri Rules of Court* (1981), page 536.

The listing of exhibits normally occurs long before trial. In this instance, with defendant's consent, additional exhibits were listed by plaintiff shortly before trial and at the beginning of trial. Neither the Detrich contract nor the record of payment to Detrich was ever listed as an exhibit. The Court infers that plaintiff was ambivalent about offering proof of the contract and proof of the payment, because such proof shows that plaintiff did not execute the contract or make the payment. Rejection of the exhibits when offered at trial would have been justified and probably required under normal circumstances, to obtain proper compliance with Local Rule 20. In the present case, however, defendant administratrix decided at trial that the exhibits favored her, and concluded that she would herself offer the Detrich contract in evidence, after ruling on plaintiff's offer was taken under advisement. Under those circumstances, the exhibits will now be admitted in evidence.

In Standard Pretrial Order No. 2, the form of which was presented to the Court as an agreed statement, neither party set forth the ultimate facts relied upon to es-

---

1. The agreed statements cover all facts which relate to liability, under the complaint and counterclaim, except for one contested fact (pertaining to the consistency of plaintiff's in-

sistence on a performance bond) which the Court deems immaterial. Additional factual details were obtained in a one-day trial.

tablish their damage claims. Defendant's claims do appear in other pretrial filings, however. The first adequate specification of plaintiff's contentions with respect to damages, either as to amount or the various steps of causation, appeared in proposed findings of fact and conclusions of law filed four days before trial. Such procedures violate the full and timely pre-trial disclosure requirements of Local Rule 20. If plaintiff were otherwise entitled to prevail, recovery might thus have been barred for the procedural reasons above stated.

For the foregoing reasons, judgment will be entered in favor of defendant, on plaintiff's complaint.

## II.

■ Turning to defendant's counterclaim for damages, it will also be rejected, for reasons set forth below.[2]

■ Hannah boarded the Celisia Ann in September, 1976, some 90 days after she sank, and began asserting claims to salvage rights. It is not completely clear whether Hannah acknowledged any further claims of the owner. He may have held a legal theory that "abandoned" maritime property can be seized by the first occupant. The Celisia Ann was not abandoned, in the legal sense allowing such a taking of title. See *The Port Hunter*, 6 F.Supp. 1009 (D.Mass. 1934). Compare *Rickard v. Pringle*, 293 F.Supp. 981 (E.D.N.Y.1968) (where a vessel had been abandoned for 60 years, ownership of a salvaged propeller vested by operation of law in the first finder lawfully and fairly appropriating it and reducing it to his possession with intention to become its owner). Even though the vessel had no value to plaintiff as an asset, plaintiff had a right to retain ownership and control at all times here pertinent in order to prevent usage which might have imposed liability or claims against it. It could not be inferred

that the owner had no intention of ever returning and exercising dominion. Elwon Hannah therefore had no right to interfere with plaintiff's title and control. *Weber Marine Inc. v. One Large Cast Steel Stockless Anchor*, 478 F.Supp. 973 (E.D.La.1979).

■ It is more likely, from the procedures followed, that Hannah was not challenging plaintiff's underlying title, but was claiming that if he salvaged the vessel he would be entitled to a generous reward for his services. Maritime law, unlike traditional common law, rewards a volunteer who assists in salvage. The liberality of admiralty law in this respect was early noted by Chief Justice Marshall. *The Blaireau*, 2 Cranch 240, 6 U.S. 240, 264, 2 L.Ed. 266 (1804). But it is equally well established that:

> Salvors cannot force themselves upon vessels in distress against the will of the master. It is at his option to accept their services or not, and if he refuses them compensation cannot be recovered for assistance subsequently rendered against his will. *The Choteau*, 9 F. 211 (E.D.La. 1881).

There can be no award to "a persistent interloper, acting at his peril after repeated warnings." *F. E. Grauwiller Transportation Co. v. The Jeanne*, 229 F.2d 153 (2d Cir. 1956). "Salvaging services should not be thrust upon the unwilling." Norris, *The Law of Salvage* (1958), 195.

Hannah cites one authority which is said to permit an award of salvage where the owner or his representative is unwilling that the salvor perform services. *The Laura*, 14 Wall 336, 81 U.S. 336, 20 L.Ed. 813 (1872). The opinion by Justice Miller is distinguishable in that the master of the owner's vessel had made only a "casual observation" to the salvor that he was seeking other assistance, and made no response to the salvor's comment that no other assistance was obtainable. 1.c. 344. The

---

2. A technical objection is made by plaintiff, asserting that Hannah could only have proceeded in rem against the vessel, rather than in personam against the owner. The procedural origins of this claim, as previously stated, show that such an insistence would be unjust. It further appears that an in personam claim is

authorized where the property has been taken from the salvor, as occurred here. *Hudson v. Whitmire*, 77 F. 846 (N.D.Fla.1896). It is therefore possible to reach the merits of the Hannah counterclaim, but it is necessary to reject the claim on the merits.

facts in that case were thus equivocal, and the Supreme Court ruled that the salvor undertook the work "in good faith." Ibid. In other words, it was concluded that the salvor did not fully realize his offer had been rejected.

■ In the present case there was an unequivocal rejection of Hannah's offer. He knew in September, 1976, that his services were not wanted, and he knew that Houston's services were being sought. No emergency forced his intervention, unless it was to take possession before Houston could begin his work. In the absence of an emergency, when a volunteer knows that the owner prefers salvage by another, the volunteer "must respect the ship's or the owner's first choice." *In re The Snow Maiden*, 155 F.Supp. 518, 520 (D.Mass.1957).

■ Hannah may have supposed that he had a right to force his services on the vessel because the owner and its insurer had delayed too long. If so, he apparently confused his rights with the statutory rights of the United States, in case of excessive delay by the owner. The volunteered services in this case do not warrant compensation, under maritime law.

It is therefore ORDERED that judgment be entered in favor of defendant on plaintiff's complaint and in favor of plaintiff on defendant's counterclaim, without assessment of costs.