## INTERSTATE LIGHTERAGE & TRANSPORTATION CO. v. NEWTOWN CREEK TOWING CO.

## NEWTOWN CREEK TOWING CO. v. INTERSTATE LIGHTERAGE & TRANSPORTATION CO.

(District Court, E. D. New York.   July 13, 1920.)

Salvage ⟜22—Salvor liable for injury caused by negligence.

A wrecking company *held* entitled to recover for services rendered in raising a tug, which had been injured and beached, but liable for damage to the tug through negligent performance of the work.

In Admiralty. Libel by the Interstate Lighterage & Transportation Company against the Newtown Creek Towing Company, with cross-libel for damages. Decree for libelant, and also for cross-libelant.

See, also, 259 Fed. 318.

Macklin, Brown, Purdy & Van Wyck, of New York City (William F. Purdy, of New York City, of counsel), for Interstate Lighterage & Transportation Co.

---

⟜For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Alexander & Ash, of New York City (Peter Alexander and Edward Ash, both of New York City, of counsel), for Newtown Creek Towing Co.

CHATFIELD, District Judge. The present action raises a pure question of fact, as there is a definite contradiction of testimony between the principal witnesses, with corroboration of the story of each.

The libelant first brought an action in rem. This court in The Convoy, 257 Fed. 843, disposed of certain legal questions presented upon that libel as drawn, but which were not dependent upon the taking of testimony. The libelant thereafter changed his action to one in personam, and sued for the sum of $1,118, for work, labor, and services in raising, pumping out, and delivering to a dry dock the tug Convoy, which had received injuries, described as holes in her bow, on a trip down the Hudson river from Yonkers, and which had been beached early in the morning of December 31st, at the head of the slip between the Erie coal docks on the north, and a coal pier on the south, at Weehawken, N. J. A bulkhead runs along the shore at the head of this slip, with a flat sand or gravel top, extending some distance inshore. The slip has been dredged along its northerly side, furnishing a deep water channel south of the Erie coal pier. The southerly portion near the head of the slip is much shallower than the dredged portion, and has a considerable slope out from the bulkhead at the head of the slip as well as on the edge of the deep water channel. But in general the shallow southerly half of the slip is more or less uniform in depth as it approaches the coal pier on the south.

The crew of the Convoy late at night ran her ashore on this shelving beach rather to the southerly side of the slip, but with her stem some feet from the bulkhead at the head of the slip. As she filled with water, she rested on an even keel and was left in that condition. A number of witnesses testify that they saw the boat lying on an even keel, and there is no reason to suppose that, lying upon the bottom, the rise or fall of the tide would cause any change in her position, unless in some way at high water she was drawn out or caused to slide out into a position where she could roll over. Immediately to the north of the Convoy was a pile driver, with its barge or tender on the north side and lying next to a barge moored on the southerly side of the Erie coal dock. The Convoy was 3 or 4 feet from the southerly side of the pile driver and apparently when left was approximately parallel to the pile driver.

The libelant's derrick barge 402, which had a lifting capacity of about 40 tons, reached the Convoy on the night of December 31st. The various witnesses seem more or less confused as to the exact date, but in general they agree as to the sequence of transactions. The 402 did not have sufficient lifting capacity to put slings under both ends of the tug and remove her bodily, or to hold her up and tow her away. The water on the south side of the Convoy was unobstructed, and the 402 was able to work in at high tide, although she took the ground in so doing. She went along the port or southerly side of the Convoy, and, by sending down a diver, put a sling through the arch of the stern post. Upon

raising the stern of the Convoy up 2 or 3 feet, or near the level of the water, it was found that the Convoy could not be lifted high enough to pump her out, and they lowered her back for the night.

It must be remembered that the last week in December, 1917, and the first part of January, 1918, saw continuous below zero temperature, with some days running several degrees below zero. The Hudson river was full of ice, and the conditions were as bad as possible for wrecking operations. But this apparently did not cause any further injury to the Convoy; it merely resulted in some delay and interference, as the pumps froze for a short period. On the following day, when the Convoy was again raised by means of the sling through the arch, it was noticed that her stern was in such position as to bring her superstructure against the rail or wearing strip of the pile driver every time the stern of the Convoy was raised up or down, and damage resulted, as the Convoy had to be again lowered. At some time during the occurrence the Convoy's house was forced over to one side, and damages, independent of the holes in her bow, resulted, for which the claimant has filed a cross-libel, claiming damage in a sum much beyond the libelant's charge for its services.

Upon the trial proof was offered showing that the libelant's charge for services was correct and not unreasonable in amount, when the conditions prevailing and the proved inability of the Merritt & Chapman and other companies to undertake the work at that time are considered. The libelant, therefore, would be entitled to recover its claim, and the real issue is the counterclaim for damage. There are a number of direct points of dispute in the testimony.

A representative of the claimant, who was neither a navigator nor a wrecker, but a man of intelligence and apparent credibility, reached the scene of the wreck on the afternoon of December 31st. He testifies that the Convoy was lying on an even keel, and that he stepped from the pile driver to the top of the deckhouse, over a gap of 3 or 4 feet. A number of other witnesses corroborate him. The captain of the 402 and another captain working for the libelant went up to look the situation over before the boat could get there, and they testify that the stern of the Convoy was so close to the pile driver that neither the pile driver nor the coal barge could be pulled out, in order to let the 402 go in on the north side. It is undisputed that on the following day a tug tried to draw out these boats, and at that time was unable to do so. But this was after the stern of the Convoy had been raised, and she had been lowered back into what the claimant alleges was a different position. There is also direct dispute as to when a line was carried to the dock on the south side of the slip from the Convoy, and whether another line was carried from the stem of the Convoy to some point on the bulkhead, so that, as the stern of the Convoy was raised, she would not roll over or slide off. Such lines ultimately were in position, but the claimant offers testimony which tends to show that these lines were not in position when the stern was raised the first time.

The claimant's witnesses allege that, as the derrick 402 raised the stern of the Convoy, two things happened: First, the Convoy slipped back, as her narrow supporting surface at the bow cut into the mud

at the head of the slip; and, second, that the downward strain upon the starboard side of the 402 lifted her port or southerly side sufficiently, so that both the derrick and the Convoy were carried, either by some slope in the bottom or by the force of the water, toward the north and closer to the pile driver. The Convoy was ultimately raised with the aid of another derrick, which placed a sling under the bow after the coal barge and the pile driver had been drawn out. But this was not accomplished until some three or four days after the first attempts.

There is nothing in the testimony which conclusively settles these disputes of fact. The witnesses are all men of apparent credibility, and it is impossible to find that any of them were deliberately making up their story. Both sides are evidently trying to recall the events and state conditions from the standpoint of their own claims, and the court is not able to base its decision upon a direct conclusion that any of the witnesses were testifying falsely. The matter, therefore, has to be disposed of solely from a determination of the preponderance of the testimony, remembering that the burden is upon the claimant to furnish a preponderance of testimony in its favor.

The testimony is so strong that the Convoy was beached on an even keel, and that her stern was not then in contact with the pile driver, that we must start with this assumption. This being so, the change in position, so that the stern of the Convoy was under the side of the pile driver, and from which damage resulted, either as the tide went up and down, raising and lowering the pile driver, or as the Convoy was raised by the 402, must have come from some movement of the Convoy. If the Convoy was raised, so that one-half of her weight, when filled with water, was resting upon her bow in soft mud and on a sloping bank, the boat would be likely to do as the claimant's witnesses testify and slip back. Even a line to the bulkhead, unless favorably placed, might not prevent this slipping or the swinging of the boat to the north. The lifting of the port side of the 402, and the moving of both boats to the north, would also be the probable result of strain upon the stern of the Convoy, and again this could only be prevented by favorable and careful location of lines to anticipate that result.

The probabilities of the case are with the claimant. It is difficult to believe that the captain of the 402, or the other wrecking captain, who went with him to visit the scene, had anticipated the situation which they experienced, if they undertook to raise the stern of the Convoy by a sling, when it was evident that she could not thus be moved, when she was in contact with the pile driver, and when damage would certainly result, but which could be avoided by a change in conditions, through the removal of the other boats. If the Convoy had been keeled over in such a way that she was resting against the pile driver, it would seem as if some effort to roll her into an upright condition, or to remove her from contact with the pile driver, would have been undertaken, instead of an attempt to raise her up in such a manner that she would apparently be allowed to roll further over.

The fact, also, that no soundings were taken, and that the captain of the derrick accepted the situation and took his derrick into the shallow water on the south side of the Convoy, to a position where he could

undertake only the maneuver which the claimant's witnesses testify he attempted, adds to the probability that an attempt was made to lift the stern of the Convoy, with the idea that she might be pumped out at low tide, and that the operation might be rendered an easy one, if conditions were favorable. When, however, the formation of the bottom caused a slight movement of the Convoy into a position where damage resulted, then, like all matters where a chance of problematical success has failed, the situation was much worse than it had been in the beginning.

Finding, therefore, that the preponderance of the weight of testimony is in favor of the claimant, we must consider whether the action of the captain of the 402, in undertaking what he did, was negligence sufficient to allow recovery on the part of the claimant. All matters of judgment may turn out contrary to what is expected, and yet the judgment may have been either the best one possible at the time, or may have been reasonable under the circumstances. In the present case the extremely cold weather, the difficulty of getting another boat, the near approach of night, the apparent ease with which the derrick was drawn in on the south side of the Convoy, all lead the court to conclude that the judgment of the captain of the 402 was made up from insufficient data, and that he should not have attempted the maneuver without making soundings and more carefully knowing what he was doing.

It is probable that, when he and the other captain visited the scene at noon, the condition of the tide was different, the depth of water on the south side of the Convoy was not known, and that, when the 402 arrived, she was put in at the south side of the Convoy and in the shallow water, owing to lack of information on the part of the captain, which he should have obtained in order to make a correct determination as to his course of action.

For these reasons it must be held that the libelant was negligent in the manner in which it conducted the raising operation of the Convoy, and that the claimant should recover on its cross-libel.

Decree for libelant for amount claimed, with decree for cross-libelant for damages sued for.