## P. DOUGHERTY CO. v. UNITED STATES.

## P. DOUGHERTY CO. v. UNITED STATES.

### Nos. 10658, 10665.

United States Court of Appeals, Third Circuit.

Argued June 5, 1952.

Reargued Dec. 1, 1952.

Decided Sept. 9, 1953.

Rehearing Denied Sept. 30, 1953.

Christopher E. Heckman, New York City (Morford, Bennethum, Marvel & Cooch, Wilmington, Del., Foley & Martin, New York City, and William H. Bennethum, Wilmington, Del., on the brief), for libelant P. Dougherty Co.

Thomas F. McGovern, Washington, D. C. (Holmes Baldridge, Asst. Atty. Gen., William Marvel, U. S. Atty., Washington, D. C., Michael A. Poppiti, Wilmington, Del., on the brief), for United States.

Before BIGGS, Chief Judge, and MARIS, GOODRICH, McLAUGHLIN, KALODNER, STALEY and HASTIE, Circuit Judges.

KALODNER, Circuit Judge.

Cross-appeals were filed from an Interlocutory Decree of the District Court ordering the United States to pay to The P. Dougherty Company one-half of the

damages suffered by its barge, Harford, while in tow of the Coast Guard cutter Mohawk, in the course of a rescue operation at sea. The District Court's Decree was based on its determination that both the Harford and the Mohawk were negligent.

Dougherty's appeal is premised on its contention that the Harford was free of negligence and that the Mohawk's negligence was the sole cause of her damage.

The United States in its appeal contends (1) the negligent steering of the Harford was the principal cause of the accident and she was solely at fault; (2) it is not liable for negligence of the Coast Guard in a rescue operation; (3) even assuming such liability exists, the standard is "gross negligence" or "wilful misconduct" and not "ordinary" or "simple" negligence as was held by the District Court; (4) the "Good Samaritan" doctrine was erroneously applied by the District Court.

It may be noted that the District Court's Findings of Fact [1] with reference to the *sequence of events* which led to this litigation are not seriously disputed.

The salient facts, evidenced by the record, are as follows:

The Harford was a wooden coast-wise barge, 267 feet long by 46 feet wide without motive power of her own, but equipped with steering gear. Her crew consisted of a master and two ordinary seamen.

On the early morning of April 22, 1947, in stormy weather and rough seas, the Harford was cast adrift and damaged in collision with another barge while in the tow of the tug Barlow off the Delaware coast. At the request of the Barlow [2] the Coast Guard Station at Cape May, New Jersey, ordered the Mohawk to proceed to the Harford. The Mohawk reached the Harford on the early evening of April 22d. At about 6 a. m. on the morning of April 23d, the Mohawk received instructions from the Coast Guard base at Cape May to tow the Harford to the Harbor of Refuge.

Following several hours delay due to the fact that the Harford had considerable difficulty in raising her port anchor, (her starboard anchor was unusable) the Mohawk got under way with the Harford in tow at 12:45 p. m. At that time the Mohawk sent a message to the Coast Guard Search and Rescue Center at Cape May advising that the Harford was unable to anchor and requesting a tug to take over the tow five miles from Overfalls Lightship, off the entrance of Delaware Bay. At 2:30 p. m. the Mohawk was advised that the tug Barlow was unable to take the barge in tow outside and was directed to proceed to the Harbor of Refuge. The Mohawk reached Overfalls Lightship in the evening.

For some time prior to the parting of the tug Barlow's towing cable on April 22d the weather had been stormy with strong winds and rough seas. By the evening of April 23d, when the Mohawk reached Overfalls Lightship, the wind had somewhat abated and the weather was clear with reasonably good visibility. The tide was at flood in Delaware Bay, setting north and northeast at a speed of about one and one-half to two knots. In the vicinity of Overfalls Lightship the Mohawk shortened her towing hawser from 100 to 30 or 40 fathoms, and at about the same time the master of the Harford turned the wheel over to ordinary seaman Norman Hill while the master went below to work on the Harford's pumps which had become clogged. The Mohawk and her tow passed abeam of Overfalls Lightship at 8:24 p. m.

The entrance to the Harbor of Refuge lies between Cape Henlopen on the south and the southerly tip of the Harbor of Refuge Breakwater on the north, a distance of about eight-tenths of a mile. The customary method of navigation for a vessel entering the harbor at flood tide with a tow is to hold close to Cape Hen-

---

1. The District Court's opinion is reported in D.C.Del.1951, 97 F.Supp. 287.

2. The Barlow departed for Lewes, Delaware to pick up a new hawser.

lopen leaving the obstruction buoys and sand bar close aboard on the port hand. This method is followed because of the strong northerly set of the flood current toward the Breakwater; it is necessary to allow ample clearance of the Breakwater to avoid being set on it by the flood current. The Mohawk originally set a course midway between Cape Henlopen and the Breakwater, but some time after passing Overfalls Lightship those in charge of the Mohawk sighted a vessel at anchor inside the Harbor of Refuge in a position which, they believed, made it necessary to alter the course of the Mohawk so as to pass between the anchored vessel and the end of the Breakwater to the north. The new course lay appreciably closer to the Breakwater than had at first been planned.

At 8:28 p. m. the Mohawk reduced her engine speed from 65 r. p. m. to 55 r. p. m., and at 8:41 p. m. further reduced it to 45 r. p. m. This action was taken apparently in the belief that both of the Harford's anchors were unusable and that therefore it would be necessary to circle around the anchored vessel inside the Harbor of Refuge until the Barlow or some other tug could come alongside and take the Harford in tow. The slow speed was thought necessary to make the circling maneuver safe. It soon became apparent, however, that the Mohawk was being carried off her course to the north, that is to the right. Several substantial changes of course to port were made, with little or no effect, and at approximately 8:57 p. m. several increases in speed were made in quick succession. The Harford, meanwhile, as the Mohawk came close to the entrance to the harbor, began to steer a course to the right, thus accentuating the effect of the current and wind upon the Mohawk. During the last fifty yards from the Breakwater the Harford went off on a more or less northerly course. The Mohawk lost steerageway, and at 9:00 p. m. her starboard side struck the end of the Breakwater. The commanding officer of the Mohawk ordered the towing hawser cut, and the

Mohawk moved away from the Breakwater, apparently undamaged. The Harford, cast adrift while still outside the Harbor of Refuge Breakwater, swung starboard side to the Breakwater and for forty-five minutes pounded against the large irregular stones of which the Breakwater was constructed. Another tug, the Jack, whose services had been secured that afternoon by Dougherty, without the knowledge of the Mohawk, then removed the Harford from the Breakwater and towed her northerly through Delaware Bay and River until the Harford's leakage became so bad as to cause her to be in danger of sinking. Thereupon the Jack beached the Harford on the sandy bottom at Joe Flogger shoal from which she was subsequently floated and towed to Hampton Roads. This beaching and subsequent towage did not increase the damage to the Harford.

On the facts as stated the District Court made the fact finding that (1) the Mohawk had been negligent in navigating too close to the Breakwater; (2) the Harford had been steered in a negligent manner in that it had failed to follow the Mohawk; and (3) the negligence of both vessels had been proximate causes of the accident.

With respect to the last-mentioned finding, it is well-settled that the ultimate finding as to liability-creating fault is but a legal inference from other facts.[3]

It must immediately be noted that we accept, for reasons subsequently stated, the District Court's findings of fact that both the Mohawk and Harford were negligent.

We further subscribe to the District Court's determination that the negligence of the Harford made her liable. We do not agree that the negligence of the Mohawk created liability as to her for three separate reasons: (1) the negligence of the Mohawk was a "condition" and not a "cause" with respect to the happening of the accident; (2) the sole cause of the accident was the negligent failure of the Harford to follow the Mohawk; and (3)

3. The E. A. Packer, 1891, 140 U.S. 360, 11 S.Ct. 794, 35 L.Ed. 453.

the District Court erred in ruling as a matter of law that "Under the Public Vessels Act the United States is liable for damage due to the negligence of those in charge of the Mohawk."

The District Court in its opinion presented in sharp focus the considerations, factual and legal, which premised its determination of liability on the part of both the Mohawk and the Harford, stating 97 F.Supp. at page 295:

"I am clearly of the opinion that the Mohawk was guilty of negligence in failing to use due care in the selection of a course that was sure to be a safe one. *I am equally of the opinion that even the course adopted by the Mohawk would have been a successful one had the Harford followed in a proper manner.*" (Emphasis supplied.)

◼ Assuming, for the sake of argument, that the District Court was correct in its conclusion of law that the United States is liable for simple negligence of the Coast Guard in the conduct of rescue operations at sea, we are of the opinion that it erred in holding the Mohawk liable in view of its express finding "that even the course adopted by the Mohawk would have been a successful one had the Harford followed in a proper manner."

◼ It is the general long-established rule in collision cases that:

"Where fault on the part of one vessel is established by uncontradict-

ed testimony, and such fault is, of itself, sufficient to account for the disaster, it is not enough for such vessel to raise a doubt with regard to the management of the other vessel." The City of New York (Alexandre v. Machan), 1893, 147 U.S. 72, 85, 13 S.Ct. 211, 216, 37 L.Ed. 84; The Ludvig Holberg, 1895, 157 U.S. 60, 72, 15 S.Ct. 477, 39 L.Ed. 620.

In applying the rule stated, it has frequently been held that even a prior act of negligence does not "contribute" if it merely creates a "condition" which makes it possible for the subsequent negligence of the other vessel to bring about a collision. Under the cases the earlier fault is held to be merely a "condition" and not a "cause" of the collision.

◼ These principles are well-established in collision cases:

Ordinarily the first wrongdoer is not responsible for damages which result from his own negligence and that of another party unless the latter's negligence was such as the first wrongdoer might reasonably have expected to occur * * * this rule is commonly expressed in terms of causation—the second wrongdoer's negligence being called the proximate cause; [4] an act, though negligent, is not the proximate cause of an injury, when but for the intervening negligence of another the injury would not have been inflicted; [5] the fault of the vessel sought to be charged must be a "cause" and not a "condition" of the collision [6] and the position of a ves-

---

4. Cleary Bros. v. Port Reading R. Co. (The Wyomissing), 2 Cir., 1928, 29 F.2d 495, 498.

5. Long Island R. Co. v. Killien, 2 Cir., 1895, 67 F. 365, 367. There a vessel which violated a state statute requiring it to navigate as nearly as possible in the center of the East River, was held *not to be condemned for a collision* "which, notwithstanding her presence there, would not have occurred if the other vessel had exercised ordinary care to avoid it." (Emphasis supplied.)

6. The Perseverance, 2 Cir., 1933, 63 F.2d 788, 790. There Judge Learned Hand stated:

"We accept the common form of statement that the fault must be a 'cause,' and not a 'condition,' of the collision. By that as we said in The Socony No. 19, [2 Cir.,] 29 F.2d 20, we mean that although the fault was a cause, in the sense that it was a part of those circumstances necessary to the occurrence, the tug was amply advised in advance of the ship's position, and could have avoided her by proper navigation. The situation is similar to that often comprised within the formula that a wrongdoer is solely liable if he has a 'last clear chance' of avoiding the damage."

sel in navigation though "unlawful" and a "maritime fault" does not in and of itself make her liable and in order to be held, her position must be the "cause" of the accident and not merely a "condition" with respect to it.[7]

In accordance with the principles stated the Courts have time and again absolved from liability vessels which had transgressed statutes requiring their navigating in mid-channel or mid-stream or had executed "unjustifiable" maneuvers where the facts demonstrated that their conduct was merely a "condition" and not a "cause" of an ensuing collision.

Thus in the early case of The Britannia, D.C.N.Y.1888, 34 F. 546 where a vessel violated a state statute requiring it " * * * be navigated as near as possible in the center of the river" the Court held 34 F. at page 557:

> " * * * the mere transgression of such a statute will not make the vessel liable where the disobedience of it did not contribute to the collision. And inasmuch as only the proximate causes of collision are deemed material, the mere fact that a vessel is on the wrong side of the river does not make her liable, if there was ample time and space for the vessels to avoid each other by the use of ordinary care. *In such cases the cause of the collision is deemed, not the simple presence of the vessel in one part of the river rather than in another part, but the bad navigation of the vessel, that, having ample time and space, might easily have avoided collision, but did not do so.*" (Emphasis supplied.) [8]

In The Morristown, 2 Cir., 1922, 278 F. 714, a violation by both tugs of the state statute requiring vessels to navigate near the center of the river was held by Judge Hough not a contributing cause to a collision which resulted from a violation by one of the tugs of the steering rules.

In The Socony No. 19, 2 Cir., 1928, 29 F.2d 20, the situation was as follows: The Socony was a tug in charge of a tow; The Marine was also a tug in charge of a tow. The Marine executed a maneuver which was "unjustifiable" but nevertheless the Court held the latter to be a "condition" not a "cause" of the collision between The Socony tow and The Marine tow. The Socony was held to be liable because she was at fault in failing to navigate properly under the circumstances.

In The Syosset, 2 Cir., 1934, 71 F.2d 666, a tug violated a New York statute by navigating down the wrong side of the East River. The Court held (Judge Augustus N. Hand) 71 F.2d at page 668:

> "It is true that the Syosset was at all times considerably to the east of the center of the stream, and therefore violated the East River statute, * * * The Sagamore was fully aware of her position in time to navigate with reference to her and her float so as to pass them safely. * * * She had no excuse for getting out of her course * * *. She could have kept out of danger by not crowding the lighter and by navigating prudently * * *. On the record before us we hold that the violation by the Syosset of the East River statute was a 'condition'

---

7. The Penoles, 2 Cir., 1924, 3 F.2d 761, 763. There the Court held that though a vessel ignored a statute requiring her to travel in the middle of a stream and "hugged" the shore, that circumstance did not of itself make her liable.

8. The holding in The Britannia was cited with approval in The Clara, 2 Cir., 1893, 55 F. 1021, 1024. There, too, the vessel failed to comply with a state statute. The Court held that she was not liable; that the fault was with the vessel which

collided with her and which had not been steered properly. In doing so the Court stated:

"A finding that negligence, or an act not amounting to a wanton wrong, is the proximate cause of an injury, is not warranted unless it appear that the injury was the natural and probable consequence of the negligence or wrongful act, and that it ought to have been foreseen in the light of the attending circumstances."

and not a contributing cause of the collision." [9]

In The Cornelius Vanderbilt, 2 Cir., 1941, 120 F.2d 766, 768, the tug Watuppa was towing the barge Essex, and the tug Hempstead was towing the Cornelius Vanderbilt. The Watuppa was on the wrong side of a narrow channel. Nevertheless it was held not liable on the ground that the Hempstead was solely at fault in unnecessarily crowding the Watuppa and Essex and it "could have avoided the collision by simply holding back in season." The Court (Judge Augustus N. Hand) stated 120 F.2d at page 768:

"Though each vessel neglected to blow passing signals, as required by the rules, and the Watuppa was on the wrong side of the channel, *the outstanding fact is that the Hempstead had the last clear chance to prevent a collision by the exercise of ordinary care*". (Emphasis supplied.) [10]

■ Applying the principles above stated to the District Court's determination "that even the course adopted by the Mohawk would have been a successful one had the Harford followed in a proper manner" [97 F.Supp. 295], we are of the opinion that the Mohawk's navigation close to the Breakwater was merely a "condition" and that the Harford's failure to follow the Mohawk was the "cause" of her damage and that, accordingly, the District Court erred in failing to dismiss the libel.

■ Our conclusion in this respect is buttressed by the fact that it has long been settled that it is the absolute duty of a vessel to follow the course of her tug and since the Harford was derelict in this respect according to the District Court's factual determination, she is without recourse to the Mohawk.

In The Maria Martin, 1871, 79 U.S. 31, 20 L.Ed. 251 a bark in tow failed to follow her tug which had ported her helm, in accordance with prescribed rules of navigation, to avoid a collision with a steamer. The tug was absolved of liability and the bark was found jointly at fault with the steamer. Said the Court 79 U.S. at page 47:

"Seasonable attention * * * would certainly have prevented a collision if the tow had followed the movement of the tug, *as she was bound to do*, without unnecessary delay." (Emphasis supplied.)

In The Columbia, 9 Cir., 1901, 109 F. 660, the ship Columbia and the bark Ravenscourt were being towed to sea by the tug Tyee, the former on the port side of the tug and the latter on the starboard side. During the course of the tow the Tyee observed a sailing vessel off her port bow and changed her course to avoid a collision. The Columbia failed to follow. Her tow line parted and she came into collision with the Ravenscourt. The Court held that the Tyee was without fault; that the Columbia was solely at fault because she had not followed the course of her tug. In doing so the Court stated 109 F. at page 666:

"It was the duty of the ship and bark to follow the course of the tug. The duty of proper steering devolved upon the respective vessels, and the tug cannot be held responsible for any fault of the vessels, or either of them, in that regard." [11]

9. In Construction Aggregates Co. v. Long Island R. Co. (The Sandmaster), 2 Cir., 1939, 105 F.2d 1009, all the vessels involved in the collision were in violation of the statute in being in the wrong part of the stream. It was held that the navigation in the wrong part of the steam was "irrelevant." To the same effect was the holding in The S. S. Deutschland, 2 Cir., 1937, 90 F.2d 454. In that case two steamers collided. The Deutschland was on the wrong side of the navigating channel in violation of a statute. Despite that fact she was held not liable—that her fault did not contribute—that the other vessel had navigated improperly.

10. To the same effect: The Sanday, 2 Cir., 1941, 122 F.2d 325; also The Lord O'Neill, 4 Cir., 1895, 66 F. 77.

11. To the same effect see The Doris Eckhoff, 2 Cir., 1892, 50 F. 134; The Virginia Ehrman, 1878, 97 U.S. 309, 24 L. Ed. 890.

It is clear from the above that the District Court erred as a matter of law in failing to dismiss the libel on the ground that the Harford had failed to discharge her duty to follow the Mohawk.

In our opinion the District Court further erred in its disposition on still another score—the challenging issue as to whether the United States is liable for fault of the Coast Guard in the conduct of a rescue operation at sea.[12]

In resolving this issue, unable to find any authority or precedent either under settled admiralty principles or the specific provisions of the Public Vessels Act, 46 U.S.C.A. § 781 et seq., the District Court resorted to the general common law rule of torts. It specifically ruled that the United States, having undertaken to maintain the Coast Guard for the purpose, in part, "to render assistance to vessels in distress" when performing the latter function acts as a "volunteer" and under the "Good Samaritan" rule of the common law rule of torts, is liable "for an injury negligently inflicted on the person or property of another," and that such negligence need only be "simple" or "ordinary" in its nature. Collaterally, the District Court further laid down the principle that a salving vessel is liable for breach of the duty of reasonable care (simple negligence) even though it acts in good faith and there is absent any element of "gross negligence", "culpable negligence" or "wilful misconduct."

As previously stated, we have accepted the District Court's factual finding that the Mohawk was guilty of lack of ordinary care in navigating too close to the Breakwater, as we have accepted its factual finding that the Harford was guilty of negligence in failing to follow the Mohawk. We have done so in consonance with the settled rule that while an appeal in admiralty partakes of a trial de novo and serves to vacate the decree of the district court, the findings of the latter when supported by competent evidence, should not be set aside on appeal except upon a showing that they are clearly erroneous.[13] With respect to the finding as to the Mohawk's negligence, the evidence does not disclose it to be "clearly erroneous";[14] with respect to the find-

---

**12.** While the issue as to the liability of the United States for fault of the Coast Guard in rescue operations has been presented in a number of cases (hereinafter listed) in the past few years, none of them reached a decision on the question, so that the District Court's ruling in the instant case is the first expression with respect to it.

(1) Lacey v. United States, D.C.Mass. 1951, 98 F.Supp. 219—failure to rescue, companion suits under Tort Claims Act and Public Vessels Act, 46 U.S.C.A. § 781 et seq., dismissed on motion.

(2) Page v. United States (The Duchess), D.C.E.D.La.1952, 105 F.Supp. 99—alleged negligence in course of rescue; held—no proof of negligence; no proof of distinguishable injury, decree for the United States.

(3) Geertson v. United States (The Anna G—CG30311), (W.D.Pa., Adm. No. 174)—alleged negligence in the course of rescue—tried at Erie, April 1, 1952 and not yet submitted.

(4) Johnson v. Sapio, United States impleaded (The Tradewinds III—C.G. 36393), (D.N.J. Civil No. 752-50), Coast Guard impleaded by fishing party boatman sued by passenger who broke leg in course of rescue. Impleader voluntarily dismissed on day of trial at Camden, November 14, 1951.

(5) Friesenborg v. The Peter Maersk and United States (The Irma-Pauline— Peter Maersk—CGC Marion), (E.D.Va., Adm. No. 7423)—suit by rescued vessel hit by the Maersk against both the Maersk and Coast Guard cutter which was towing the rescued vessel. Voluntarily dismissed as to Government on July 28, 1951.

(6) Charles W. Smith, Inc. v. United States (The Olivia Brown—Navesink), (S. D.N.Y., Adm. No. 165-387)—alleged negligence in course of rescue—suit at issue since October, 1950.

(7) CGC Yocona—Kallie P., Hansen v. United States, (D.C.Ore. No. 6634)—suit begun September, 1952.

**13.** Swenson v. Argonaut, 3 Cir., 1953, 204 F.2d 636; Read v. United States, 3 Cir., 1953, 201 F.2d 758.

**14.** It is immaterial that an opposite conclusion might well have been reached by

ing as to the Harford's negligence, the evidence demonstrates it to be fully warranted.

We cannot, however, subscribe to the District Court's ruling of law that the United States is liable for fault of the Coast Guard in conducting a rescue operation at sea.

■ We are of the opinion that public policy dictates that the United States should not be liable for fault of the Coast Guard in the field of rescue operations. There are two arrows in the quiver of this public policy. The first may be directed to the inevitable consequence on the morale and effectiveness of the Coast Guard if the conduct of its officers and personnel in the field of rescue operations under the indescribable strains, hazards and crises which attend them, is to be scrutinized, weighed in delicate balance and adjudicated by Monday-morning judicial quarterbacks functioning in an atmosphere of serenity and deliberation far from the madding crowd of tensions, immediacy and compulsions which confront the doers and not the reviewers.[15]

In its intramural aspects the Coast Guard functions, as do the other branches of the armed services, on a system of merits and demerits, promotions and demotions based on efficiency or lack of it, in their conduct and operations. A judicial determination that officers or men of the Coast Guard have been negligent in rescue operations would inevita-

bly have a concomitant effect upon their service records. Aware of that fact, the instinct of self-preservation would inevitably function even under the pressures of life or death crises which so often arise in rescue operations when members of the Coast Guard are called upon to make decisions. If men are to be brought to an abrupt halt in the midst of crisis—to think first that if they err in their performance they may expose their Government to financial loss and themselves to disciplinary measures or loss of existing status, and then to pause and deliberate and weigh the chances of success or failure in alternate rescue procedures, the delay may often prove fatal to the distressed who urgently require their immediate aid. Thus would the point of the second arrow in the quiver of public policy be blunted —the arrow which is directed to preserve in the public interest our merchant marine and that of other nations with which we trade.[16]

History establishes that tragic losses in men and ships all too frequently attend disasters at sea, and too often is it impossible to give successful succor despite the most gallant and efficient of efforts. To expose the men in the Coast Guard to the double jeopardy of possible loss of their own lives, and loss of status in their chosen careers, because they failed, in coping with the intrinsic perils of navigation, to select the most desirable of available procedures, or their skill

the District Court; that it might have found (1) the Mohawk had used reasonable care; or (2) the Mohawk was guilty of error but not of fault. Cf. The Grace Girdler, 1869, 74 U.S. 196, 205, 19 L.Ed. 113. There the Court held infallibility is not required in navigation and distinguished between "error" and "fault", stating "In the eye of the law the former error) does not rise to the grade of the latter (fault), and is always venial."

15. Witness the District Court's statement: "I am clearly of the opinion that the Mohawk was guilty of negligence in failing to use due care in the selection of a course that was *sure to be a safe one.*" [97 F.Supp. 295.] (Emphasis supplied.)

16. Cf. The Island City, 1862, 66 U.S. 121, 130, 17 L.Ed. 70. There the Supreme Court cited with approval the principle applicable in salvage cases that "Public policy encourages the hardy and industrious mariner to engage in these laborious and sometimes dangerous enterprises * * *" and "* * * the general interests of society require that the most powerful inducements should be held out to men to save life and property about to perish at sea. * * *" In The S. C. Schenk, 6 Cir., 1907, 158 F. 54, at page 60, the Court (Judge Lurton, later Justice Lurton of the Supreme Court) stated: "Salvage service in the public interest should be encouraged."

was not equal to the occasion, is unthinkable and against the public interest.

As counsel for the Government pointed out in its brief, the training motto of the Coast Guard has been: "In the Coast Guard you always have to go out, but you don't have to come back", and its personnel have adhered to the finest traditions of the sea in hastening to succor the distressed without regard to their own safety.

Consideration must be given to another facet of this problem, viewed from the standpoint of the merchant marine itself, and the marine insurance companies. A loss of a vessel, even though it is insured, means a loss of revenue to the shipowner until it is replaced, and it takes time to build ships. And as to the marine insurers, salving of stricken vessels means a reduction in their losses. Conversely, total losses mean higher insurance rates, which make for heavier operating costs to the shipowners, which are in turn passed on to those engaged in the export and import trade.

That these considerations have prevailed is evident from the fact that for some twenty-five years after the Public Vessels Act of 1925[17] imposed liability upon the United States for damages caused by the negligent operation of its public vessels, there was no attempt to recover damages arising out of any rescue operations of the Coast Guard.[18] It was not until some three years ago that such suits were instituted. See Note 12.

It is interesting to note that in United States v. Taylor, 1903, 188 U.S. 283 at page 289, 23 S.Ct. 412, at page 414, 47 L.Ed. 477, the Supreme Court of the United States indicated serious doubt whether the United States " * * *

---

17. 46 U.S.C.A. §§ 781–90.

18. The Coast Guard makes many thousands of rescues a year, many of which result in injury to persons or property saved, according to counsel for the United States. Annual reports of the Secretary of the Treasury furnished by the United States disclose in summary the following statistics for the years 1948 to 1951, inclusive:

*1948*

| | |
|---|---|
| Number of instances of major assistance | 5,923 |
| Value of vessels assisted | $157,430,859 |
| Value of cargoes of vessels assisted | 12,555,679 |
| Lives saved or persons rescued from peril | 5,399 |
| Number of instances of minor assistance | 4,152 |

*1949*

| | |
|---|---|
| Number of instances of major assistance | 5,016 |
| Value of vessels assisted | $184,452,494 |
| Value of cargoes of vessels assisted | 15,134,401 |
| Lives saved of persons rescued from peril | 5,423 |
| Number of instances of minor assistance | 4,578 |

*1950*

| | |
|---|---|
| Number of assistance calls responded to | 10,440 |
| Number of instances of major assistance | 3,860 |
| Number of instances of minor assistance | 4,782 |
| Value of vessels and aircraft assisted | $210,489,172 |
| Value of cargo of vessels and aircraft assisted | 22,932,918 |
| Lives saved or persons rescued from peril | 7,619 |

*1951*

| | |
|---|---|
| Number of assistance calls responded to | 12,974 |
| Number of instances of major assistance | 5,275 |
| Number of instances of minor assistance | 4,469 |
| Value of vessels and aircraft assisted (including cargo) | $403,382,286 |
| Lives saved or persons rescued from peril | 4,996 |
| Vessels refloated | 1,035 |
| Disabled vessels towed to port | 5,882 |

could, in any case, be regarded from the standpoint of a mere salvor * * *." [19]

On the score of liability of salvors in general, we must record our disagreement with the District Court's ruling that a salvor is accountable for simple negligence. The overwhelming weight of opinion is that absent "gross negligence" or "wilful misconduct" a salvor is not liable.[20] It was early held "the evidence must be conclusive before they (salvors) are found guilty",[21] and the law accords the presumption of innocence in favor of salvors.[22]

It is not to be inferred from our discussion of the standard of care imposed upon salvors that we have held that the United States (via the Coast Guard) is

19. There the United States Navy undertook to salvage The Infanta Maria Teresa, a Spanish vessel which had been sunk by the Navy while attempting to run a blockade from the habor of Santiago in the Spanish American War. The sunken vessel was raised and after temporary repairs, while in tow of a United States repair ship and a wrecking tug, privately owned, again sunk during a severe storm. The United States had entered into a contract with a private wrecking company to conduct the salvage operations but at the time the vessel sank an Officer of the Navy was in charge of the operation. The Court dismissed the libel, stating:

"The government acted with due prudence in employing persons whose business it was to do such work, to raise and deliver the vessel at the Norfolk Navy yard. If no attempt had been made, the vessel would finally have gone to pieces where she lay.

"Salvors are not held responsible for a loss when attempting to salvage in good faith, and with reasonable judgment and skill (The Laura, 14 Wall. 336, [20 L. Ed. 813] * * *) and we know of no reason why the government should be held to a more rigorous accountability, *even if it could, in any case, be regarded from the standpoint of a mere salvor of the property of another.*" (Emphasis supplied.)

20. The Henry Steers, Jr., D.C.N.Y.1901, 110 F. 578, distinguished between want of ordinary care and culpable negligence and stated the rule to be that the salvor is only liable for gross negligence or recklessness. In The S. C. Schenk, 6 Cir., 1907, 158 F. 54, at page 59, it was held: "'* * * But does it follow because her attempt to assist in the salvation of the Bourke (the towed barge) was not attended with success that she (the Schenk) is to be condemned for her loss, *even though her efforts were not guided by the best skill and her management not above criticism?* * * * The Bourke's loss is attributable to the Schenk only in the sense that her voluntary effort to help her *was not efficient.* * * * *There is no suggestion of bad faith or willful misconduct.* * * * *There was no gross neglect.* At most the negligence in this matter was slight and not enough to condemn the Schenk as having proximately caused the loss of the Bourke. * * * *But when, as here, liability is sought to be fastened upon a salving vessel solely because the attempted service was ineffectual, no independent injury having been caused by the salvor, there is no responsibility if the service was rendered in good faith, without clear evidence of culpable negligence or willful misconduct.*" (Emphasis supplied.) See also Dorrington v. City of Detroit, 6 Cir., 1915, 223 F. 232, 241; The Daniel Kern, D.C. Wash.1928, 27 F.2d 920, 921. The English Courts have long subscribed to the same view. In The Baltic, 4 Law Rep. A. & E. 178 (1874) Sir Robert Phillimore stated:

"The question I have had to take the opinion of the Elder Brethren on is this—whether the damage on all of these occasions, but especially on the second, when the material damage was done, can fairly be excused on the ground of accidental mishap, having regard to the size of the vessel and other circumstances, or whether it shews *crassa negligentia,* as we are in the habit of saying—*gross want of proper navigation,* which certainly would, in my judgment, render her liable for the damage that she thus caused, notwithstanding that she was acting as a salvor." (Emphasis supplied.)

21. The Charles Adolphe, Swabey's Admiralty Reports, 153, 156 (1856). In The Henry Steers, Jr., Note 20 supra, it was stated [110 F. 583]:

"* * * condemnation for negligence should be made sparingly * * *. In short, the law should not scrutinize too narrowly (salving) services rendered * * *."

22. Kennedy, The Law of Civil Salvage, page 145.

to, or can be, regarded from the standpoint of a mere salvor.[23]  Cf. United States v. Taylor, supra.

For the reasons earlier stated the Interlocutory Decree of the District Court will be reversed and the causes remanded with directions to proceed in accordance with this opinion.

BIGGS, Chief Judge (dissenting).

I regret that I cannot agree with the interpretation put upon the facts by the majority. It is indeed an extraordinary interpretation. Nor can I agree with the majority view as to the applicable principles of law.

### I.

The customary and indeed the only safe course of navigation for a vessel with a tow to enter the Harbor of Refuge at flood tide after passing Overfalls Lightship (because of the strong northerly set of the tide toward the Breakwater) was to hold very close to Cape Henlopen, leaving the obstruction buoys and sandbar very close to the port.  A projected course, at its inception, must provide for a very ample clearance of the Breakwater if a vessel is to escape being put upon it by the tide.  The majority admit that the Mohawk did not pursue this safe course.  *First,* she originally set a course midway between Cape Henlopen and the Breakwater.  Next, after passing Overfalls Lightship, the Mohawk sighted an unidentified vessel at anchor inside the Harbor of Refuge in a position which made it necessary (the Mohawk's navigating officer erroneously thought) for the Mohawk to alter her course still further toward the Breakwater so that she and the Harford might pass safely between this unidentified anchored vessel and the southerly end of the Breakwater.  The Commander of the Mohawk, believing that both of the Harford's anchors were unusable, had planned to circle around the unidentified vessel until the Barlow, or some other ship, could take the Harford in tow.

Having thus originally embarked on a dangerous course, the Mohawk, immediately on passing Overfalls Lightship, in order to avoid the unidentified anchored vessel, greatly increased the danger to herself and to the Harford [1] by setting a course even closer to the southerly end of the Breakwater.  The dangers of collision with the Breakwater became imminent.  This fact was instantly apparent to a disinterested and experienced

---

23. Section 1 of the Public Vessels Act provides that "A libel in personam in admiralty may be brought against the United States * * * for damages caused by a public vessel of the United States * * *."  Section 3 continues: "* * * Such suits shall be subject to and proceed in accordance with the provisions of (the Suits in Admiralty, Merchant Vessels Act of March 9, 1920, c. 95, 41 Stat. 525, 46 U.S.C.A. §§ 741–52) * * * insofar as the same are not inconsistent herewith * * *."  Section 3 of the Merchant Vessels Act provides: "Such suits shall proceed and shall be heard and determined according to the principles of law and to the rules of practice obtaining in like cases between private parties."  This statute was held by the United States Supreme Court to impose upon the United States the same liability "* * * as is imposed by the admiralty law on the private shipowner * * *."  Canadian Aviator, Limited v. United States, 1945, 324 U.S.

215, 228, 65 S.Ct. 639, 646, 89 L.Ed. 901.  However, there is no status or relationship in the realm of private vessels comparable with that which exists between a vessel in distress and a Coast Guard vessel which comes to her rescue, since it has long been the settled policy of the United States not to make salvage claims and thus there are no "like cases between private parties" to which the Courts may refer in consonance with Section 3 of the Merchant Vessels Act. The District Court noted "No authority or precedent has been cited or found regarding the duty of a privately owned vessel giving gratuitous assistance to another." [97 F.Supp. 292.]

1. Lieutenant Vogelsang, the navigating officer of the Mohawk, testified that the closest the Mohawk could come with safety to the Breakwater was 300 or 450 feet because, with the strong tide-set, the Harford would strike the Breakwater even with the towing hawser shortened to about 200 feet.

observer, Captain Tracy of the pilot boat "Philadelphia". The pilot boat was on her regular station between Overfalls Lightship and the Harbor of Refuge and Captain Tracy was in a position to observe accurately. He testified that the Mohawk at first was properly lined up when she started toward the Breakwater but after proceeding two-thirds of the course in, the Mohawk continuously showed a broad green light to the Philadelphia. The Mohawk was drifting steadily to starboard when she should have been porting her helm. As Captain Tracy put it: *"Then I saw where the Mohawk was going to get into a jam and the barge, and I said to myself, 'I don't know whether they are going to make the stone pile or outside the stone pile.'"* (Emphasis added.) The Mohawk was then 500 feet from the Breakwater.

The Mohawk then accentuated the dangerous situation even more by shortening the towing hawser from one hundred fathoms (about 550 feet) to thirty or forty fathoms (about 220 feet).[2] The Mohawk towed the Harford, an unloaded seagoing barge, 267 feet long and 46 feet wide, without motor power of her own, on a short hawser. The Harford was unloaded and she rode with her rudder half out of water. This, plus a heavy ground swell increased greatly the difficulty of steering her.

Next, augmenting the ever increasing danger, the Mohawk reduced her speed from 65 r. p. m. to 55 r. p. m., and a few minutes later again reduced her r. p. m. to 45 (little more than bare headway). This reduction in speed was thought to be necessary in order to avoid striking the unidentified anchored vessel. But the reduction in speed[3] also reduced the ability of the Harford's helmsman to follow the Mohawk to the *minimum*. While the Mohawk increased her speed to some small degree immediately thereafter, the situation had become catastrophic. Failing a complete reversal of course, collision of the Mohawk herself with the Breakwater was inevitable. Thereafter the Mohawk, in quick succession made several rapid changes of course to port, but both the Mohawk and the Harford were by then within a few feet of the Breakwater; the Harford within 50 feet of it.

A few seconds later the Mohawk struck the end of the Breakwater with her starboard side.[4] She immediately cut the towing hawser and retreated out into the stream for half a mile. The Harford was forced by wind and tide against the side of the Breakwater. The Commander of the Mohawk stated what had happened succinctly and accurately, when, forty minutes after the accident, he sent this message to the Coast Guard station: "In towing barge Harford into Harbor of Refuge current and wind effects were greater than rudder and increased speed of vessel, causing Mohawk to rub the end southern of outer breakwater. Tow was cut loose and drifted alongside breakwater just north of Harbor of Refuge Light * * *"

To hold the Mohawk not guilty of fault in navigation under the circumstances, as do the majority, seems almost incredible.[5] Here is a towing vessel which puts *herself* as well as her tow

2. See the testimony of Commander Lecky of the Mohawk, viz., that it is more difficult to steer a barge when a 200 foot towing hawser is used than when a 600 foot hawser is employed. See also that of Captain Barlow of the tug Barlow: "30 fathoms of wire is not enough to tow a seagoing barge."

3. See again the testimony of Commander Lecky.

4. It is astonishing to note that immediately after the moment of impact of the Mohawk with the Breakwater, she came inside the Breakwater while the Harford was still on the outside of the Breakwater. The towing hawser was actually lying slack around the bight of the Breakwater. Even at this point the Mohawk, by reversing her course, could have taken the Harford away from the windward, the foul, side of the Breakwater as later did the tug, Jack.

5. The conclusion is all the more remarkable when one observes the size and bulk of the Mohawk. See the photographs of the Mohawk, Respondent's Exhibits Nos. 4, 5 and 6.

on a breakwater and the majority say that she was not at fault. When a towing vessel casts herself on a breakwater under the circumstances at bar I am astonished that an experienced admiralty court should hold that her navigation was without blame. Finding the Mohawk to be without fault in herself striking the Breakwater, should not the majority, as an inherent necessary corollary, hold the Harford liable for the accident to the Mohawk? Should it not be the rule that tows, when tows and towing vessels go aground, should be held liable for the damage sustained by the towing vessels? Such would be a novel departure from existing law but is it not the rule actually set up by the majority opinion in the instant case? The majority conclusion as to lack of fault of the Mohawk is rendered all the more remarkable by the complete disregard of the testimony of Captain Tracy of the pilot boat, Philadelphia, and the message of the Commander of the Mohawk sent immediately after the accident and hereinbefore quoted. Captain Tracy was in a position to observe the dangerous position in which the Mohawk had placed both herself and the Harford and pungently commented on it.[6] The message of the Mohawk's Commander seems equally conclusive.

The position of the majority of this court and of the court below [7] is that the collision of the Harford with the Breakwater would not have occurred had she been properly steered. This position is demonstrably fallacious from one undisputable fact alone; viz., that the Harford was within 50 yards of the Breakwater when the Mohawk began her rapid increases in speed.[8] But there are many more facts which prove conclusively that the Harford followed the Mohawk as well as circumstances permitted and that the collision occurred only because the officers and quartermaster on the bridge of the Mohawk were unaware of the proximity of the Breakwater. As has been said, the Harford's rudder was half out of water.[9] Captain Tracy said the Harford was "setting on top of the water". The towing hawser had been shortened and the speed of the flotilla greatly reduced. There was also a heavy following ground swell and the tide was running at 1½ knots at flood in the direction in which the Mohawk and the Harford were proceeding. These conditions combined to make close following of the Mohawk by the Harford impossible.

And Quartermaster Tillson of the Mohawk, the man actually at her wheel during the latter and disastrous part of the

6. The majority endeavor to avoid the result of the very active negligence of the Mohawk by referring to the *actual* towing of the Harford into ever increasing danger as a "condition". I think the majority are deluding themselves by the use of a word. The term, condition, is usually employed to designate a status. A condition is created by an act or acts which have come to rest. The act is then considered as too remote, reasonably, to constitute a contributing factor to the accident. When one vessel tows another it is an act, not a condition.

7. Note that the court below did *not* find the Mohawk to be without fault. The court below expressly found to the contrary.

8. This fact is proved by the Mohawk's own "Bridge Book". See entries of Wednesday, April 23, 1947, Respondent's Exhibit

No. 1. See the line reading, "2058 Harbor of Refuge Lt. ahead to starboard distance 50 yards." The time indicated was but two minutes before the collision. It will be observed that the line quoted as originally written has been stricken out but that the words are repeated two and a half lines below. It will also be observed that in the lines preceding the stricken line, are a number of course directions, inserted above the lines. I think that these innocent corrections demonstrate that the Mohawk's navigating officers did not know precisely what courses their vessel was pursuing at the moment of crisis.

9. The Harford had been injured in the stem but it is an undisputed fact that the damage was above the water line and that the Harford was not shipping water through the bow during the tow.

tow, swore in respect to the Harford's steering: "I would still say as far as I was concerned it [the Harford] was steering fairly good coming in until *we* [the Mohawk] *hit the breakwater there. Right off of there she* [the Harford] *took off.*" (Emphasis added.) Quartermaster Tillson also testified that *he never saw the end of the Breakwater,* the point struck by the Mohawk! Lieutenant Vogelsang, the navigating officer of the Mohawk (who was conning the vessel), testified, when asked why he continued steadily on his planned course: "It was evident to me that we were going to make the breakwater *with no trouble* until we were within about 50 yards of the breakwater." (Emphasis added.) When the Mohawk herself was but 50 yards from the Breakwater, Lieutenant Vogelsang, the navigating officer of the Mohawk, proceeding steadily by his own admission on his original plotted course, became aware for the first time of the danger the flotilla was in. Lieutenant Vogelsang testified that when he saw the light on the end of the Breakwater [10] it was but 50 yards away and that its nearness came as a "terrific surprise" to him. It was then but two minutes before the accident. Lieutenant Thistle, a deck officer of the Mohawk, who was on the bridge at the latter part of the tow, testified that at 20.57, three minutes before the Mohawk hit the Breakwater, there was a conference between Commander Lecky, Lieutenant

Vogelsang and himself as to the change in course to be pursued by the Mohawk in order to avoid the Breakwater. According to Lieutenant Thistle's testimony it was only shortly before this that he began to have a "shadow of doubt" as to the safe position of the flotilla. According to the Mohawk's "Bridge Log," immediately following the line respecting the Breakwater light being but 50 yards away and the time being 20.59, 60 seconds before the accident, comes the dramatic announcement "Losing steerage way Increased speed to standard speed with 25° Left Rudder." It was then too late to avoid the accident. In culmination of all of this see the testimony of Commander Lecky of the Mohawk. He said pointedly: "We learn a great deal by experience. The next time I will come awful close [to Cape Henlopen]." The testimony referred to seems almost unbelievable but it is the evidence of the Mohawk's own responsible officers. As such it must be credited.[11]

In view of the evidence I cannot but conclude that the Harford did not contribute to the accident and that the collision resulted because the Mohawk was "grossly" negligent and lacking in seamanship in the sense that the majority employ the term "grossly". At the very least the record demonstrates that the Mohawk was guilty of "ordinary" negligence as the majority use that term.

10. The light was at least 20 feet above the water and had been visible for miles.

11. Under all the circumstances it seems futile for Commander Lecky and 1st Lieutenant Harrison, the executive officer of the Mohawk, to endeavor to put the blame for the accident on the young man who was at the helm of the Harford during the closing period of the tow. These officers testified that the Captain of the Harford, when asked why the Harford steered with "less talent" shortly before the collision with the Breakwater, said, "At those times that young kid was steering." Yet Quartermaster Tillson of the Mohawk who, as we have pointed out, was actually in charge of the steering of that vessel, swore that the steering of the Harford was " * * *

fairly good coming in until we [the Mohawk] hit the breakwater * * *". A franker attitude on the part of these officers of the Mohawk named would be more acceptable.

There is not a word in any log book or written record of the Mohawk to suggest that the steering of the Harford was a source of difficulty. Commander Lecky *did not suggest such a thing in* his message to the Coast Guard Station immediately following the accident. The brief and unconvincing hearsay testimony as to the alleged incompetency of the Harford's helmsman seems to me to be a rationalization to salve what must have been an acutely embarrassing situation for the officers of the Mohawk.

## II.

We really are not free to decide, contrary to the majority view, that liability may not be imposed on the United States by reason of acts of public vessels. This question has been decided for us by the Supreme Court of the United States. Coast Guard vessels are public vessels. The United States has consented to be sued for torts committed in the operation of public vessels on specified statutory terms. Section 1 of the Public Vessels Act provides that: "A libel in personam in admiralty may be brought against the United States * * * for damages caused by a public vessel of the United States * * *." [12] Section 2 states: "* * * Such suits shall be subject to and proceed in accordance with the provisions of [the Suits in Admiralty Act of March 9, 1920, c. 95, 41 Stat. 525, 46 U.S.C.A. §§ 741-752] * * * insofar as the same are not inconsistent herewith * * *." It is settled law that this section makes the provisions of the Suits in Admiralty Act a part of the Public Vessels Act, insofar as there is no inconsistency. See Canadian Aviator, Ltd. v. United States, 1945, 324 U.S. 215, 228, 65 S.Ct. 639, 646, 89 L.Ed. 901. Vital to the instant case are those provisions of Section 3 of the Suits in Admiralty Act which state: "Such suits [against the United States] shall proceed and *shall be heard and determined according to the principles of law* and to the rules of practice *obtaining in like cases between private parties.*" (Emphasis added.) The effect of the two sections, read together, was succinctly stated by the Supreme Court in Canadian Aviator, supra, [324 U.S. 215, 65 S.Ct. 646] as follows: "Since we hold that the Public Vessels Act was intended to impose on the United States the same liability (apart from seizure or arrest under a libel *in rem*) as is imposed by the admiralty law on the private shipowner, it remains [only] to be considered whether petitioner states a valid cause of action under general principles of admiralty law, *in rem* and *in personam.*"

I conclude that under the ruling in Canadian Aviator both the procedural and substantive law applicable to the instant controversy must be determined by examining the principles that would govern similar litigation between private shipowners. A special rule of exemption may not be created by judicial decision for Coast Guard vessels. But the majority take the view that public policy requires that the United States should not be liable for any "fault" or tort of the Coast Guard in the field of "rescue" operations.[13]

The application of the doctrine of Coast Guard vessel immunity in the very broad terms in which the majority have laid this principle down, would relieve the United States of any liability whatsoever for any fault or misfeasance by the Coast Guard during the course of such operations. It is unnecessary for the majority decision to go so far for having held that the Mohawk's towing, since it had become a "condition", did not cause the collision of the Harford with the Breakwater, that portion of the majority opinion dedicated to the Coast Guard exception is purest *dicta*. I cannot bring myself to believe that Congress, implicitly and *sub silentio*, intended to relieve the United States for lia-

---

12. Act of March 3, 1925, c. 428, 43 Stat. 1112. 46 U.S.C.A. §§ 781-790.

13. The majority opinion states: "We are of the opinion that public policy dictates that the United States should not be liable for fault of the Coast Guard in the field of rescue operations. There are two arrows in the quiver of this public policy. The first may be directed to the inevitable consequence on the morale and effectiveness of the Coast Guard if the conduct of its officers and personnel in the field of rescue operations under the indescribable strains, hazards and crises which attend them, is to be scrutinized, weighed in delicate balance and adjudicated by Monday-morning judicial quarterbacks functioning in an atmosphere of serenity and deliberation far from the madding crowd of tensions, immediacy and compulsions which confront the doers and not the reviewers."

See also the following paragraphs of the majority opinion.

bility for the torts of Coast Guard vessels. In asserting the contrary proposition I cannot help but believe that the majority is substituting sentiment[14] for the plain provisions of the Public Vessels Act. I do not decry the bravery of the Coast Guard or its usual competency but we are dealing in the instant case with an Act of Congress clearly expressing the congressional intent,[15] and with certain specific acts of the Coast Guard in the course of its operations with the Harford. The conclusion seems inescapable that the United States must answer for the Mohawk's "fault" or torts.

The majority even indicate doubt that a Coast Guard vessel may ever be viewed as a salvor.[16]

### III.

But the majority assert additional grounds for relieving the United States of liability. Holding that the Mohawk's negligence, since it had become a "condition", did not cause the collision, the majority conclude, also by way of *dictum*, even assuming *arguendo* that a Coast Guard vessel could have the status of a salvor, that liability could be successfully asserted against the United States only where the Coast Guard was guilty of "gross negligence" or "wilful misconduct" in salvage operations. The majority assert that a salvor, when a private individual or corporation, as distinguished from an agency of the United States, by the "overwhelming weight" of authority cannot be held liable for "ordinary" negligence, which, say the majority, (while denying there was any negligence of the Mohawk which caused the accident) is the kind of negligence which, at worst, was demonstrated by the Mohawk by the circumstances at bar. It follows, say the majority, that no liability can possibly attach to the United States under the Public Vessels Act in the case at bar.

Conceding that the operations of the Coast Guard in this case were salvage or "rescue" operations and that the Mohawk was guilty of only "ordinary" negligence, I must disagree with the majority statement that the overwhelming weight of authority renders the salvor liable only if he has been guilty of "gross negligence" or "wilful misconduct". I believe that the weight of authority is to the

---

14. See the language quoted in note 13, supra, and the paragraphs of the majority opinion immediately following the paragraph quoted.

15. The majority point out that this is the first case in which the Coast Guard has been held for negligence by a District Court of the United States but the idea that the United States might be held liable for Coast Guard vessels' torts is not a novel one. See the cases cited in note 12 of the majority opinion.

16. The majority opinion cites United States v. Taylor, 1903, 188 U.S. 283, 23 S.Ct. 412, 47 L.Ed. 477, in support of the proposition that the United States, acting through the Coast Guard, cannot be viewed as a salvor. It should be pointed out that when this case was decided the Supreme Court did not have before it the Public Vessels Act of 1925. Moreover, in the body of the majority opinion the single truncated phrase quoted does not realistically present the view of the Supreme Court. The body of majority opinion states: "It is interesting to note that in United States v.

Taylor * * * the Supreme Court of the United States indicated serious doubt whether the United States ' * * * could, in any case, be regarded from the standpoint of a mere salvor * * *.' " I have italicized that portion of the opinion of the Supreme Court in the Taylor case quoted in the majority opinion.

The full text of the pertinent paragraph is set out in note 19 of the majority opinion. I repeat it again here in order to avoid misunderstanding. It is as follows, omitting citations of authorities: "Salvors are not held responsible for a loss when attempting salvage in good faith and with reasonable judgment and skill, and we know of no reason why the government should be held to a more rigorous accountability, even if it could, in any case be regarded from the standpoint of a mere salvor of the property of another." See 188 U.S. at page 289, 23 S.Ct. 412, at page 414, 47 L.Ed. 477. The Taylor case does not seem to support the majority view.

contrary and renders the salvor liable where his negligence has been only "ordinary" as the majority employ that term.

In support of their position the majority cite five cases, four American decisions and one English decision. These five authorities are as follows: The Henry Steers, Jr., D.C.E.D.N.Y.1901, 110 F. 578; The S. C. Schenk, 6 Cir., 1907, 158 F. 54; Dorrington v. City of Detroit, 6 Cir., 1915, 223 F. 232, 241; The Daniel Kern, D.C.W.D.Wash.1928, 27 F.2d 920, 921; and The Baltic, L.R. 4 A. & E. 178 (1874). These cases will be discussed here in the order presented in the majority opinion. See also note 20 cited to that text.

The Henry Steers, Jr., decided in 1901, is the first American decision which I have found or which has been cited to us in which the phrases "culpable negligence" and "gross negligence" have been used. A salvor attempting to save a tug and her tow from going aground later permitted them to go aground on the same shore, which the flotilla was seeking to avoid, against a dangerous breakwater. The tug was grounded on the rocks and damaged. The negligence displayed by the salvor was about of the kind displayed by the Mohawk under the circumstances at bar. Both the libel for salvage and the libel for damages were dismissed.

In The S. C. Schenk, decided in 1907, the Schenk, a towboat, filed a libel to recover for salvage services rendered to the barge, "Bourke" and a cross-libel was filed by the owners of the Bourke for damages, alleging negligence on the part of the salvor. The libel and the cross-libel were both dismissed. The court held as to the Schenk that [158 F. 60]: "There was no gross neglect. At most, the negligence * * * *was slight* and not enough to condemn the Schenk *as having proximately caused the loss of the Bourke.*" (Emphasis added.) The court went on to say " * * * when, as here, liability is sought to be fastened upon a salving vessel *solely because the attempted service was ineffectual, no independent injury having been caused by the salvor,*

there is no responsibility if the service was rendered in good faith, without clear evidence of culpable negligence or willful misconduct." (Emphasis added.)

But in the prior line of the identical paragraph just quoted from the court said: "When a *distinguishable injury has resulted from the negligence of one undertaking a salvage service, there may be not only forfeiture of all right of salvage, but an affirmative award of damages against the salving vessel.*" (Emphasis added.) It will be observed hereinafter how widely the interpretation of the Schenk decision by the majority of this court differs from that of the Court of Appeals for the Second Circuit in that court's unanimous opinion in The Cape Race, 1927, 18 F.2d 79.

In Dorrington v. City of Detroit, decided in 1915, a moored sailing vessel, the Maria Martin, slipped her moorings in a gale and came into collision with a bridge owned and operated by the City of Detroit. A fire boat belonging to the City was ordered to take her in tow. A line was put on the Martin by the fire boat but it slipped its post. Thereafter, another line was fastened to a quarter-post inside the "skin" of the Martin but this was pulled up by the roots when the fire boat tightened the line. The Martin then went against the bridge which had not been opened by the bridge-tender despite signals given to him to do so, seriously damaging the Martin. The owner of the Martin, Dorrington, brought suit against the City of Detroit. The District Court held against the libellant. On appeal the Circuit Court of Appeals for the Sixth Circuit held, 223 F. at page 239, that the City of Detroit was responsible for not opening the bridge and therefore the libellant was entitled to damages.

As to the liability of the fire boat the Court of Appeals said: "We are not able to say that the District Judge was wrong in exonerating the fire boat from the charge of negligence in tying to the quarter post, and should not, in any event, disturb his finding unless it were against the decided preponderance of the

evidence. * * * We do not find such preponderance here. In some respects the case is like that of The S. C. Schenk referred to. So far as the captain of the fire boat knew, the ship was lost unless he went to her rescue. What he did in attempting to fasten the hawser was probably what any one would have done except one of great experience in towing vessels. To hold him negligent in not seeking some post which would certainly hold, if any of them would have held, would be to discourage laudable attempts to save vessels in distress by the deterrent fear of a claim for damages if the attempt failed." [223 F. 241]

The Court of Appeals went on to say: "There certainly is no clear evidence of culpable negligence or willful misconduct. What Judge Lurton says in the Schenk Case is particularly applicable * * *: 'But when, as here, liability is sought to be fastened upon a salving vessel *solely because the attempted service was ineffectual, no independent injury having been caused by the salvor*, there is no responsibility if the service was rendered in *good faith*, without clear evidence of *culpable negligence* or *willful misconduct*.' " [17] (Emphasis added.)

It will be observed that the fire boat in the Dorrington case, if it was negligent at all, was but slightly so. Judge Rodney in the court below in the instant case, citing the Steers decision, said that the rule laid down by it " * * * was apparently followed in Dorrington v. City of Detroit, * * * and in the more recent case of The Cape Race, 2 Cir., 18 F.2d 79". [97 F.Supp. 291] From it he deduced the principle that a salvor is held to the exercise of reasonable care in the rendering of his service. Judge Rodney said: "The use of the term 'culpable negligence' in Judge Lurton's opinion does not, in my opinion, necessarily mean 'gross negligence,' but rather a failure to exercise the degree of care which had previously been specified in his opinion [in the Schenk case], namely, reasonable care." See 97 F.Supp. at page 291. I agree with Judge Rodney. The word "culpable" used in the connotation in which it is employed in the Schenk case and in the Dorrington case means nothing more than "blameworthy" or "censurable"; namely, that the salvor did not

17. The words "independent injury" "caused by the salvor" are used in some of the decisions as the equivalent of the words "distinguishable injury" "caused by the negligence of one undertaking a salvage operation" or " * * * independent injury having been caused by the salvor". What is meant is that the salvor by his negligence has caused an "independent", viz., a "distinguishable" injury to the salved vessel.

In other words the terms "independent injury" and "distinguishable injury" are given the same meaning in the decisions, these phrases being almost always employed when the injury to the salved vessel is caused by the negligence of the salvor who affirmatively carries on a salvage operation as distinguished from a mere ineffectual salvage service.

See, for example The Henry Steers, Jr., 110 F. at page 588, where reference is made to "(3) Specific negligence, proximately resulting in distinguishable injury to the vessel". The S. C. Schenk, 158 F. at page 60, citing The Henry Steers, Jr., where it is said, "But when, as here, liability is sought to be fastened upon a salving vessel solely because the attempted service was ineffectual, no independent injury having been caused by the salvor * * *", and, in particular, The Cape Race, 18 F.2d at page 81, where the Court of Appeals of the Second Circuit, quoting from The S. C. Schenk, said "When a distinguishable injury has resulted from the negligence of one undertaking a salvage service, there may be not only forfeiture of all right of salvage, but an affirmative award of damages against the salving vessel."

The cases cited are discussed at some length in this opinion.

I am of the opinion that every decision cited by the majority or in this opinion would be fully reconciliable if unwitty diversities of negligence were not employed, viz. "*gross*" as distinguished from "*ordinary*". One should look to see what the salvor has done. If he has embarked on a salvage operation and injury has resulted to the salved vessel by his negligence, he should be held liable. This, as appears in this opinion, I believe to be the existing admiralty law.

exercise the degree of care which was reasonable under the circumstances.

In The Daniel Kern, decided in 1928, the court quoted the language of the Schenk case *verbatim* but went on to say that since the officers of the claimant, the salvor, were acting in good faith and had exercised reasonable judgment and skill and that there was no evidence of "culpable negligence" or "wilful misconduct" a salvage award should be made. It is difficult to see how this decision greatly aids the majority view. A tug was towing a barge and landed her on a reef. But the court found that the tug was exercising *"reasonable judgment and skill"* [27 F.2d 921] (emphasis added), and denied recovery against her. While the court quoted the phrases on which the majority rely from Judge Lurton's opinion in The Schenk it is obvious that the court did not regard these phrases as possessing the meaning which the majority places upon them. They were used rather to express blameworthy seamanship; viz., seamanship lacking in the ordinary skill to be expected of the experienced mariner.

In the English case, The Baltic, decided in 1874, particularly relied on by the majority, the Baltic was a bark which had been in collision with two other sailing ships. The Baltic was not in danger of sinking but was having difficulty navigating. She signalled the Butler, a steam vessel, to come to her assistance. The Butler did so but in the process of laying on a line collided three times with the Baltic. Later, the Butler having taken the Baltic in tow, a hawser broke. The Butler moved astern with a view to shortening the remaining hawser and struck the bowsprit of the Baltic, breaking it. It was in this case that Sir Robert Phillimore made use of the phrases of *"crassa negligentia"* and "gross want of proper navigation", saying that this rendered the Butler liable for the damage to the Baltic. But compare The Thetis, L.R. 2 A. & E. 365, decided by Sir Robert Phillimore in 1869, only five years before The Baltic. The decision in this case is referred to again at a later

point in this opinion and it is sufficient to say here that the Thetis *sank*, not merely damaged, the Sardis, which she was attempting to tow to port. Sir Robert Phillimore held the Thetis guilty only of negligence, not gross negligence, but nonetheless allowed an affirmative recovery against her.

A point must be accentuated here as to the decisions cited by the majority. It is made apparent by the language of the Schenk decision, quoted with approval in the Dorrington opinion, viz., that in these cases the salvor was freed of liability because the salving service was merely ineffectual and no independent (viz., distinguishable) injury to the salvaged vessel was caused by negligence of the salvor. The fact that no independent injury was caused by the salvor to the salved vessel is the critical fact which determined the lack of liability on the part of the salvor.

There are, however, numerous decisions which hold that "ordinary" negligence, as distinguished from "gross negligence" or "wilful misconduct", on the part of a salvor may be the basis for recovery by the salved vessel. We will cite these decisions in the order of time in which they were handed down. As will later appear, it is immediately apparent that if the Schenk case and Dorrington v. City of Detroit, be construed as the majority of this court construe them, there is a conflict between the rulings of the Courts of Appeals of the Sixth and Second Circuits.

In The Laura, 14 Wall. 336, 20 L.Ed. 813, decided in 1872, the Laura went to the rescue of the Savory and attempted to salvage her but in the course of the operation the Savory was lost. The owners of the Savory sued the Laura for damages. The libel was dismissed. The question was raised as to whether or not the master of the Laura had acted in good faith. The Supreme Court stated: "We think that the master of the Laura was authorized to conclude that the Savory was in a condition of immediate peril, and abandoned so far as any timely effort to save her was contemplated

that *he acted in good faith, and with reasonable judgment and skill,* and that therefore, the libel of appellants' was properly dismissed by the Circuit Court." (Emphasis added.)

In The Allegiance, 1 Fed.Cas. pages 431, 433, No. 207, decided by the United States District Court for the District of Oregon in 1879, the sailing vessel "Allegiance" was taken in tow by a tug, the owner of which subsequently claimed salvage. The salvor, due to the exigencies of wind and tide, left her in a shoal bay whence she had to be dragged the next morning, having sustained some injury to her hull. The owner of the Allegiance filed a libel for damages asserting that the salvage had been performed unskillfully. The salvor claimed a salvage award. The court said: "The tug took hold of the vessel in an extraordinary emergency, with a view to save her from what appeared to be an impending peril, and therefore did not engage to do anything more than she could do with the aid of ordinary skill and diligence on the part of her master and crew. A salvor's compensation depends upon the success of the undertaking, but there is no implied obligation that he will succeed or that he is capable of so doing, *and therefore he is only responsible for the exercise of ordinary skill and diligence in the use of the means or machinery with which he undertakes the salvage service."* (Emphasis added.) The court allowed the salvage claim and dismissed the libel filed by the owners of the Allegiance.

In Serviss v. Ferguson, 84 F. 202, decided in 1897, the Court of Appeals for the Second Circuit affirmed *per curiam* a decision of the United States District Court for the Southern District of New York. Serviss, the owner of a scow, brought suit against Ferguson, the owner of the tug "Governor", to recover damages for the loss of the scow. The Governor found the libellant's scow adrift in the East River with no one aboard her and towed her into a slip, mooring her outside of another scow there made fast to the dock. Thereafter, one of the other

boats in the slip was run upon the scow, sinking her.

The District Court stated in its opinion, 84 F. at page 203, "The rule of diligence obligatory on salvors is that of *ordinary care, such as persons of reasonable prudence would naturally be expected to exercise for the preservation of their own property from loss or injury under like circumstances.* * * * I cannot conceive that a man of reasonable prudence would have left his own boat in that manner, liable to be destroyed by the boats moving back and forth in the slip * * *. I must, therefore, allow a decree for the libelant, which will be for the value of the scow at the time she sank in the slip, less one-third thereof, deducted as an allowance for the salvage service. If it seems a hardship to require the defendant to pay for a boat they have rescued, possibly from complete destruction, it must be remembered that the compensation which the court awards for salvage services includes the recompense for all the necessary care of the salved property; and that the seeming hardship is no other or different than that in which any other negligent loss involves every ordinary bailee for hire." (Emphasis added.) This is a case in which the negligence of the salvor was "ordinary" negligence, in the sense that that descriptive term seems to be employed in the majority opinion.

In United States v. Taylor, 188 U.S. 283, 289, 23 S.Ct. 412, 414, 47 L.Ed. 477, supra, decided in 1903, a condemnation proceeding and referred to in the majority opinion in support of their position as to the liability of the salvor only for gross negligence or wilful misconduct, and also, albeit somewhat contradictorily in support of their position that a vessel of the United States may not be regarded as a salvor, a libel in prize had been filed by Admiral Sampson against the Spanish warship "Infanta Maria Teresa". The United States entered into a contract with a salvage or wrecking company to raise the vessel. The In-

fanta was raised and was being towed to Norfolk when she encountered a severe storm. After some hours she was turned loose by the tow in a sinking condition and drifted to an island where she struck on the rocks and became a wreck. The Supreme Court of the District of Columbia had entered a condemnation decree awarding prize money. The Supreme Court of the United States reversed this decree, stating: "Salvors are not held responsible for a loss when attempting salvage in good faith, and *with reasonable judgment and skill* (The Laura, 14 Wall. 336, sub nom. Norcross v. The Laura, 20 L.Ed. [813], 814), and we know of no reason why the government should be held to a more rigorous accountability, even if it could, in any case, be regarded from the standpoint of a mere salvor of the property of another." (Emphasis added.) See the reference to this case at an earlier point of this opinion and note 16, supra.[18]

In Interstate Lighterage & Transportation Co. v. Newtown Creek T. Co., 267 F. 989, 992, 993, decided by the District Court of the United States for the Southern District of New York in 1920, Interstate entered into a salvage contract with Newtown to raise the barge "Convoy". Interstate performed the salvage operation in such a way that the Convoy was damaged. Interstate filed a libel against Newtown to recover salvage and Newtown filed a counter-libel against Interstate to recover for the damage to the Convoy. The court stated: "If the Convoy was raised, so that one-half of her weight, when filled with water, was resting upon her bow in soft mud and on a sloping bank, the boat would be likely to do as the claimant's witnesses testify and slip back. * * * The lifting of the port side of the * * * [Convoy], and the moving of both boats to the north, would also be the probable result of strain upon the stern of the Convoy,

and again this could only be prevented by favorable and careful location of lines to anticipate that result." The court went on to say: "For these reasons it must be held that the libelant was negligent in the manner in which it conducted the raising operation of the Convoy and that the claimant should recover on its cross-libel. Decree for libelant for amount claimed, with decree for cross-libelant for damages sued for." This was a contract salvage case and for this reason an attempt may be made to distinguish this decision from one of ordinary salvage but the court made no reference to such a distinction and applied the regular Second Circuit rule.

In The Cape Race, 18 F.2d 79, supra, decided in 1927 by the Court of Appeals for the Second Circuit, the libellant, the owner of the barge "Cape Race", brought suit against the tug "Thetis" and the tug "Woodmancey". The Cape Race had been made fast to the port side of the Thetis, and on reaching Hell Gate, the steering cable of the Thetis parted. The Thetis and the Cape Race began to drift toward the shore. The Woodmancey came up to assist but collided with the Cape Race and damaged her.

The panel consisted of Judges Hough, Hand and Mack and the opinion was written by Judge Hough.[19] Judge Hough stated, 18 F.2d at page 81: "We think it plainly proven that collision arose from a miscalculation of the currents, which had turned the Cape Race completely around, and would certainly twist her again. It was a case of 'close shaving,' and also of approach at too great speed. This was negligence, and the direct cause of injury." The court went on to say: "It may be gathered from the cases that negligence in a would-be salvor is perhaps viewed with a benevolent eye; but, when plainly proved, it entails responsibility, as does negligence in the performance of any

---

18. It should be observed that the interpretation which I put upon this decision finds full support in American Jurisprudence. See 47 Am.Jur. "Salvage", para. 25, p. 277.

19. It is my understanding that Judge Hough is considered to have been one of the great admiralty judges of the United States.

other assumed or imposed duty. That for negligence a salvage award may be diminished or denied we have pointed out in Serviss v. Ferguson [supra]; the George W. Elzy, 2 Cir., 1918, 250 F. 602. *Generally every salvor is bound to the exercise of ordinary skill and diligence.* The Allegiance, [supra]. The matter was exhaustively considered by Lurton, J., in The S. C. Schenk [supra] with this result: *'When a distinguishable injury has resulted from the negligence of one undertaking a salvage service, there may be not only forfeiture of all right of salvage, but an affirmative award of damages against the salving vessel.'* This we think such a case." (Emphasis added.) A money award was accordingly given against the Woodmancey.

Attention is called to the use of the phrase by Judge Hough in The Cape Race "a distinguishable injury", *resulting from the negligence of one undertaking a salvage service apart from mere ineffectual salvage service.* This, as I have said before, is the *ratio decidendi* of the American cases (with the possible exception of The Steers) awarding or refusing to award damages to a salvor, or mitigating the amount of the award, or rendering a money decree affirmatively against the salvor. If distinguishable injury results from the negligence of the salvor to the salved vessel, the award may be decreased or refused, or an affirmative money decree may be given against the salvor. I have found no case, and none has been cited to us other than The Steers, in which the salving vessel having been negligent and by her *independent* negligent action, in contrast to mere ineffectual salvage service, having caused *distinguishable* injury to the salved vessel, the salvor has not been held liable for the damage by the admiralty court. I think that this is the *ratio decidendi* of the decisions cited by the majority with the possible exception of The Steers.

But whether I am right or wrong in this hypothesis it is clear that the negligence of the Woodmancey, whether it be called "ordinary" or "gross" or "culpable", was of a kind very definitely similar to that of the Mohawk in the case at bar. The distinguishable injury to the Harford resulted from the negligence of the Mohawk and it will be observed how close the facts in The Cape Race are to those at bar. I do not believe there is any very substantial difference in the views expressed by the Sixth and Second Circuit Courts of Appeals in respect to the liability of a salvor. Confusion lies in the action of the majority in apparently placing equal emphasis on the phrases "gross negligence" or "wilful misconduct" and treating them as if they were equivalent phrases and had equivalent results on salvage awards.

An examination of the English authorities, the source of American admiralty decisions, convinces me that the majority do not fully apprehend or, at least, do not appreciate the substance of the English maritime law respecting salvage. The term "gross negligence", "*crassa negligentia*", occurs as infrequently in the English decisions and textbooks as in the decisions of the United States courts but as one reads the English decisions and, in particular, the English text-books, a view, respecting the negligence of salvors, quite different from that expressed by the majority of this court emerges.

Under the English view "wilful misconduct" or "bad faith" on the part of salvors invariably will cause the forfeiture of salvage. In "The Law of Civil Salvage", by Lord Justice Kennedy, 3rd ed., Stevens, London 1936, at p. 163, the language of Dr. Lushington in The Magdalen, 31 L.J.Adm. 24, 26 (1861) is quoted: " 'The principles are these that salvage is forfeited by wilful misconduct, bad faith and intention not to do the whole of a duty, or an intention to protract doing that duty for purposes of piracy.' " There is no doubt of the application of this principle both in England and the United States. But *wilful misconduct* or *bad faith* is not frequently displayed by salvors and there are not many cases decided on such circumstances.

What is more pertinent here, as Lord Justice Kennedy makes clear, id. supra, at p. 169, is that early in the English admiralty law, full damages arising from collision were *"decreed against those who had been trying to render salvage service when their service caused the mischief."* (Emphasis added.) In support of this proposition, Lord Justice Kennedy cites The Thetis, supra; The Baltic, supra, and The Dwina, P. 58 (1892).

The efforts of salvors to effect salvage, while viewed leniently, are nonetheless to be carefully scrutinized. Lord Justice Kennedy in the same work, at p. 162, says: "In considering whether a salvor has shown *such a want of reasonable skill and knowledge as ought materially to affect the Court's award, or is guilty only of an error of judgment,* the court will incline to the lenient view and will take into favorable consideration any special circumstances which tend to exonerate the salvor from blame * *"*, (Emphasis added.) citing The Cheerful, 11 P.D. 3 (1885); The Perla, Swab. 203 (1857); The Rosalie, 1 Spinks, E. & A. 188 (1853); and The Dwina, supra.

In "The Law Relating to Shipmasters and Seamen", by Kay, Vol. II, Stevens, London, 1875, Section 3, at p. 1087, the following statement is made: *"Negligence or unskillfulness.* When persons undertake to perform a salvage service it is their duty to exercise *at least ordinary skill and prudence in the execution of the work,* which they have taken upon themselves to perform." (Emphasis added.) The same authority at the following page states: "Where nautical men act as salvors their salvage reward will be diminished, if they have neglected to exercise *such ordinary prudence and skill as might reasonably be expected of them.",* citing, *inter alia,* The Cape Packet, 3 W.Rob. 122 (1848), The Perla, supra, and The Magdalen, supra.

In "The Law of Salvage", by Jones, Stevens, London 1870, at p. 141, the following statement is made: "If in consequence of the *unskillfulness or negligence* of those on board her, the salving vessel should come into collision with the vessel which she is endeavoring to assist, she will be held liable in damages as in an ordinary case of collision. Thus when the steamer Thetis fell in with the steamer Sardis which had been disabled in consequence of an accident to her machinery, and, in endeavoring to tow her into port for an agreed sum, negligently came into collision with and sunk the disabled vessel she [the Thetis] was held to be solely blamable and condemned in damages."

That the negligence of salvors will reduce the amount of the award under the admiralty law of both England and the United States is beyond doubt. But it is also clear—and this I think is a point which the majority fail to grasp—that the English take a very broad view of what constitute "acts of misconduct". See "The Law of Salvage, Towage and Pilotage", by Newsom, Clowes, London 1886, at p. 13, as follows: "The following acts of misconduct on the part of salvors will tend to diminish the amount of the award, viz.:—* * * *the salvors damaging or endangering the ship or property salved by their want of prudence or skill * * *"* (Emphasis added), citing, *inter alia,* The Perla, supra, and The Magdalen, supra. When English maritime authorities speak of "acts of misconduct" they refer to bad or unskillful seamanship which endangers the vessel or the property salvaged. They do not use the term "misconduct" in the same opprobrious sense that we would ordinarily employ it. They mean simply that the salvor is liable for bad seamanship, as distinguished from good seamanship. Such phrases as "culpable negligence", "acts of misconduct" are really of the same *genera* and relate, as has been said, to bad or unskillful seamanship of the sort not to be expected of the experienced mariner. Very bad seamanship may evoke from the English courts no worse a characterization than "negligence": for example, in The Thetis, where the Thetis sank the Sardis. Seamanship of a less bad quality may evoke the phrase *"crassa negligentia"*

used by the court in The Baltic, to characterize the seamanship of the Butler which did not sink the Baltic but merely damaged her. There is no magic in the particular phrase used, as the majority seem to suggest, unless the conduct of the salvor is sufficient to constitute "wilful misconduct" or "bad faith". When the phrases last quoted are used by an English court, the court means that the conduct of the salvor has far exceeded any kind of *negligence* and is not to be included in that term. The actions of the salvor have contained an element of malice and no award of any kind is considered. But if the salvor has not been guilty of *wilful misconduct* or of *bad faith,* a salvage award to him is considered by the court. If the attempted salvage has been merely ineffectual and damage thereafter comes to the vessel attempted to be saved, no fault is found with the would-be salvor. If, on the other hand, an *independent* (viz., a distinguishable) *injury* has resulted to the salved vessel from the negligence of one undertaking a salvage service, the salvage award may be refused or diminished or an affirmative money award may be given against the salvor as Lord Justice Kennedy has pointed out. There is no magic to be found in characterizing the salvor as having been *grossly* negligent or *ordinarily* negligent. If independent (viz., distinguishable) injury has resulted from the negligence of the salvor the award is affected in almost every instance. As to the italicized words see note 17, supra. The only possible exception is where the negligence of the salvor has been very slight. Compare the circumstances of the instant case.

### IV.

(1) Assuming that the negligence of the Mohawk was only "ordinary" and was not the cause of the accident as do the majority, but concluding, as does the present writer, that the Mohawk's negligence was the proximate cause of the collision with the Breakwater, under the status imposed on the Mohawk as a public vessel of the United States by the Public Vessels Act a money award should be given against the United States.[20] As has been pointed out the authorities show that independent (distinguishable) injury resulting to a salvaged vessel from the negligence of the salvor must be charged against the salvor and counted against any salvage award. While it has been the settled policy of the United States not to make salvage claims because of Coast Guard operations,[21] this cannot mean that the law of salvage applicable to litigation between private parties is inapplicable here and should not operate on the facts at bar to impose liability on the United States. If the private salvor fails to file a libel for salvage the owner of the salved vessel would not be barred from maintaining his suit against the salvor for independent injuries resulting to his vessel from the salvor's negligence. The court would make a money award against the salvor if it found that independent (distinguishable) injury resulted to the salved vessel because of the negligence of the salvor.

So here. The United States has asserted no salvage claim against the owner of the Harford and therefore there can be and is no salvage award (assuming that the United States would be entitled to one) to be set off against the amount of the damage caused by the Mohawk. But this fact should not prevent an affirmative money award being given against the United States in the case at bar if, as I believe is true, the injury to the Harford resulted from the negligence of the Mohawk. In other words the United States is not automatically insulated from liability simply because it makes no salvage claim for Coast Guard

---

20. In my opinion the negligence of the Mohawk was the proximate cause of the accident. My view, of course, is contrary to the majority finding as indicated at an earlier point.

21. See The Borgfred, 1936 A.M.C. 804; The Impoco, D.C.S.D.N.Y.1922, 287 F. 400; 1 Benedict on Admiralty 346 (Knauth's 6th ed.)

salvage operations and hence has made none here. If the Coast Guard negligently caused the damage to the Harford, the owner of the barge is entitled to gain a money award from the United States.

(2) As has been stated, I am of the opinion that the Mohawk was *grossly negligent* (as the majority use that term) in her salvage operations and that the damage to the Harford resulted solely from this cause. If the test be *gross negligence,* as the majority insist it must be, the Mohawk was grossly negligent in her salvage operations and the damage to the Harford resulted therefrom. It follows that the United States should be held liable for the damages suffered by the Harford and a money judgment in favor of her owner should be given against the United States.

(3) Finally, if the Mohawk did not have the status of a salvor—and the majority at least suggest doubt as to a Coast Guard vessel having such a status—she is in the position of one who assuming to act, does so negligently and damage ensues. As Judge Cardozo said in Glanzer v. Shepard, 1922, 233 N.Y. 236, 238, 135 N.E. 275, 276, 23 A.L.R. 1425, "It is ancient learning that one who assumes to act, even though gratuitously, may thereby become subject to the duty of acting carefully, if he acts at all." Compare Restatement, Torts, §§ 323 and 324. The Mohawk acted negligently and hence a money award for the damages suffered by the Harford should be given against the United States.

I would reform the decree of the court below and would hold the United States liable for all the damage suffered by the Harford.

GOODRICH, Justice (dissenting).

I agree with the dissent of Chief Judge Biggs, and add a few words only to emphasize what is said in the quotation from Glanzer v. Shepard. Dean Ames, writing in 2 Harv.L.Rev. 1, on "The History of Assumpsit" pointed out on page 2:

"The earliest cases in which an *assumpsit* was laid in the declaration were cases against a ferryman who undertook to carry the plaintiff's horse over the river, but who overloaded the boat, whereby the horse was drowned; * * * against surgeons who undertook to cure the plaintiff or his animals, but who administered contrary medicines or otherwise unskilfully treated their patient; * * * against a smith for laming a horse while shoeing it; * * * against a barber who undertook to shave the beard of the plaintiff with a clean and wholesome razor, but who performed his work negligently and unskilfully to the great injury of the plaintiff's face; * * * against a carpenter who undertook to build well and faithfully, but who built unskilfully. * * *"

"And in those cases," the dean stated, "consideration has * * * never played any part in the declaration."

In other words, one who carelessly hurts the person or property of another is liable, whether he was rendering his service for pay or for nothing. With a statute making the United States, with specified exceptions, liable as any individual defendant would be, the application of the general rule seems pretty clear in this case. And the United States need have no more fear of consequences than anyone else.

STALEY, Circuit Judge (concurring in part, dissenting in part).

I agree with Chief Judge Biggs that the Mohawk was at fault and that her fault was causative and that the United States, under the Public Vessels Act, may be held for damage caused by the negligent conduct of Coast Guard vessels. I agree with the majority that the Harford was also at fault and that her fault, too, was causative. Certainly, the findings, made by the district court, underlying those conclusions are not so

wrong as to be clearly erroneous. I would affirm the decree of the district court.